841 A.2d 828

**DARCARS MOTORS OF SILVER SPRING, INC.**

v.

**Marcin BORZYM.**

**No. 33, Sept. Term, 2003.**

Court of Appeals of Maryland.

Feb. 9, 2004.

---

Brent M. Ahalt (John P. Lynch of McNamee, Hosea, Jernigan, Kim, Greenan & Walker, P.A., on brief), Greenbelt, for Petitioner.

Lloyd J. Eisenberg (Lloyd J. Eisenberg & Associates, P.A., on brief), Silver Spring, for Respondent.

James E. Gray, Stephen E. Marshall, Mitchell Y. Mirviss, Vanable, Baetjer and Howard, L.L.P., Baltimore, brief of Amicus Curiae Wachovia, N.A. for Petitioner.

Argued before BELL, C.J., ELDRIDGE *, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, J.

Darcars Motors of Silver Spring, Inc., petitioned this Court to review an award for punitive damages in favor of Marcin Borzym, who prevailed in a jury trial on a claim of conversion against Darcars. We conclude that the evidence was sufficient to support the jury's finding that actual malice motivated the tort. Further, we hold that Borzym had no duty to present evidence of Darcars' financial condition in support of his pursuit of a punitive damage award.

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

## I. Background

In late March of 2000, Marcin Borzym, who was 21 years old at the time, visited Darcars several times to consider purchasing a 1999 BMW 323i, which he had seen advertised in a newspaper for $27,500. The first of these visits took place on Sunday, March 26, when Borzym met with a salesperson, Juste Bahula, and test drove the BMW. Borzym returned to Darcars the following Monday to negotiate the purchase of the car. Again, he met with Bahula, who discussed various aspects of the potential purchase and accepted a personal check for $3,000 from Borzym as a symbol of his willingness to negotiate seriously.[1] Two days later, Borzym stopped by Darcars for further negotiations after Bahula telephoned him. Borzym and Bahula discussed a lower purchase price of $26,000 because there was a scratch on one of the wheel rims, and Darcars permitted Borzym to take the BMW for inspection by another dealer. On Thursday, after the inspection was completed without any problems discovered, Borzym returned the BMW to Darcars. Borzym then informed Darcars that he would come back to the dealer the next day to purchase the BMW.

Borzym returned to purchase the car during the evening of Friday, March 31. To complete the purchase, Borzym met with a finance manager of Darcars, Douglas Quander, who was responsible for negotiating the amount of the down-payment and other payment terms, including financing rates. Borzym handed $2,500 in cash to Quander as a down-payment. In addition, Quander had Borzym complete and sign several documents, including (1) a credit application, (2) a purchase order, (3) a retail installment contract, (4) a supplementary agreement to a conditional sales contract, (5) an application for a certificate of title, and (6) an agreement to provide accidental physical damage insurance.[2] Borzym, however, did not

---

1. Darcars never cashed the check and, at some point, returned it to Borzym.

2. The purchase order, signed by both Quander and Borzym, indicates that a cash deposit of $2,500 was submitted with the order and was

leave with the BMW that night, because he was unable to provide information about a State Farm automobile insurance policy that he believed would cover the BMW. When he returned, once again, to the dealer early Saturday morning, he provided the insurance information and left with the BMW. On Sunday, Borzym realized that he had not received any documents reflecting the BMW purchase, so he returned to Darcars, picked up copies of the paperwork, and left without incident.

On Monday morning, Darcars representatives began to question the accuracy of some of the information contained in the sales documents. That day, Robin Stein, a financial services manager from Darcars, and Quander contacted Borzym by phone to tell him that there was a problem with his automobile insurance information and that he needed to provide information of a different policy. Borzym responded to their requests by obtaining a new policy and informing Stein about that policy information on Tuesday morning. Later that afternoon, Stein called back several more times, however, complaining of further discrepancies in the paperwork and asking Borzym to return to Darcars as soon as he could so they could resolve the issue.

Quander also called Tuesday afternoon in hopes of persuading Borzym to meet with him as soon as possible to address the discrepancies in the paperwork. He was so eager to meet Borzym that he offered him a $500 car service credit if Borzym would come into the dealership. In addition, Quander told Borzym that he was willing to meet him on Tuesday at 10:00 p.m. at Borzym's health club. No meeting took place on Tuesday, however.

Borzym had no further contact with Darcars until the morning of Thursday, April 6, when he walked to the garage where he had parked the BMW and was surprised to see a truck from a repossession company towing the car from the

---

credited to the purchase price of $26,000. The retail installment contract, however, shows that a $5,000 deposit had been received.

garage. Borzym asked the driver why the BMW was being repossessed, and the driver told him that there was a "problem" with the "dealership" and that he should go there to resolve it. Inside the BMW when it was repossessed were, according to Borzym, his laptop computer, which he valued at approximately $1500, and his collection of music CDs, which he valued at $300.

Borzym called Darcars immediately and spoke to Stein. When he asked why the BMW had been repossessed, she refused to give him a reason over the phone but told him to come to the dealer to discuss the matter. Borzym complied, making it to Darcars later that evening to meet with Stein and two other representatives of Darcars, a sales manager and the head of Darcars security. One of the Darcars representatives told Borzym that the car had been repossessed because Borzym "didn't pay anything." Borzym insisted that he had paid $2,500. He asked for the return of either the BMW with his belongings, the laptop and CDs, or the return of his deposit and his belongings. One of the Darcars representatives replied, "Forget about it. Get out of here. . . . [C]all your attorney." The representative told Borzym that the BMW had been taken to a different lot, and as for the laptop and CDs, he should "[j]ust forget about it, just get out of the office, [and] get lost."

Followed by Darcars staff, Borzym walked outside, where he met his father. When Borzym's father learned what had happened with the BMW and his son's belongings, he became upset and confronted Darcars staff. One of the personnel who had met with Borzym began "waving goodbye and making fun" of the Borzyms. This prompted Borzym's father to walk closer to the staff member, but a security officer stepped in the way. The staff member then began "cursing out" the Borzyms, accusing them of being "thieves." Darcars did not return the $2,500 cash down-payment, nor did Borzym recover the laptop and CDs that had been taken during the repossession.

██ Alleging causes of action for breach of contract, conversion, fraud, illegal repossession and punitive damages, Borzym sued Darcars on May 8, 2000, in the Circuit Court for Montgomery County. The Circuit Court dismissed his claims of fraud, illegal repossession and punitive damages, and Borzym amended his complaint to allege only breach of contract, conversion, punitive damages, and illegal repossession. Before trial, the court granted summary judgment to Darcars on the illegal repossession claim, and, during trial, Borzym abandoned his claim of breach of contract. Only Borzym's claim that Darcars converted Borzym's $2500 down-payment, laptop, and CDs went to the jury, which on April 3, 2001, returned a $4,300 verdict[3] in favor of Borzym and made a specific finding

---

3. To reach a compensatory damage verdict of $4300, the jury added $1800, the value of Borzym's laptop and CDs, to the alleged cash down-payment of $2500. We question whether the $2500 cash payment should have been recovered in conversion, however. As a general rule, money, i.e., currency, is not subject to a claim of conversion unless the plaintiff seeks to recover specific segregated or identifiable funds. *Allied Investment Corp. & Allied Venture Partnership v. Jasen*, 354 Md. 547, 564, 731 A.2d 957, 966 (1999); *Lawson v. Commonwealth Land Title Ins. Co.*, 69 Md.App. 476, 481–82, 518 A.2d 174, 176–77 (1986); *see also Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 732 F.2d 859, 862 (1984) (applying Alabama law and stating that, generally, an action for the conversion of cash will not lie unless the cash is "specific money capable of identification"); *ATD Corp. v. DaimlerChrysler Corp.*, 261 F.Supp.2d 887, 898 (E.D.Mich.2003) (stating that, under Ohio law, an action for conversion of cash lies "only where the money involved is 'earmarked' or is specific money capable of identification ... and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum"). Unlike with the laptop and CDs that were identifiable items over which Darcars exercised control, Darcars did not have an obligation to return the specific bills used for the down-payment. Rather, once Darcars repossessed the BMW, Darcars owed a debt of money, which could have been satisfied by payment by check or other currency besides the specific bills that Borzym tendered. It is doubtful that a claim of conversion was available to Borzym as a means to recover the $2500.

Consequently, Borzym should have maintained the action for breach of contract to recover the cash payment. His breach of contract claim, however, never reached the jury because the trial judge, mid-trial, decided not to instruct the jury on breach of contract and narrowed the claims to one of conversion. Whether this occurred at Borzym's request, by agreement of the parties, or by order of the judge, *sua sponte,* is not clear from the record.

that Darcars had acted with actual malice, warranting punitive damages. After hearing testimony on the amount of punitive damages, the jury returned a punitive damage award of $100,000. The Circuit Court reduced that award to $25,000 after Darcars filed a Motion for Judgment Notwithstanding the Verdict and/or Motion for Remittitur. Darcars thereafter appealed.

The Court of Special Appeals affirmed the judgment of the Circuit Court. *Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md.App. 18, 818 A.2d 1159 (2003). The intermediate appellate court addressed three issues: (1) whether the evidence was sufficient to support a finding of actual malice, (2) whether Borzym adequately pled a claim for punitive damages, and (3) whether the evidence of Darcars' financial condition was sufficient to support the $25,000 punitive damage award.[4] As to the first issue, the court held that circumstances of the case allowed an inference to be drawn that Darcars acted with actual malice when it converted Borzym's down-payment, laptop, and CDs. According to the Court of Special Appeals, one incident that stood out as suggesting malice was the conversation in which a Darcars employee told Borzym to "[f]orget about it," "[g]et out of here," "[c]all your attorney," and "[g]et lost." *Id.* at 51, 818 A.2d at 1177. The court also found it notable that Darcars did not assert a claim of right to the $2,500 or that it had an honest belief that it was

---

What is clear, however, is that Darcars did not argue before the Circuit Court, the Court of Special Appeals, or this Court that cash could not be the subject of conversion. Moreover, neither Borzym nor Darcars have claimed in this proceeding that the conversion claim, itself, was faulty or that the award of compensatory damages should be set aside. We, therefore, have no occasion to disturb the jury's verdict on those grounds. *See* Maryland Rule 8–131(b) (limiting the scope of this Court's review, generally, to those issues raised in the petition for certiorari or cross-petition).

4. Borzym also filed a cross appeal in which it claimed that the Circuit Court abused its discretion in reducing the jury's punitive damage award of $100,000 to $25,000. The Court of Special Appeals held that the Circuit Court used appropriate discretion in reducing the award, and Borzym did not challenge this ruling in any cross-petition for certiorari.

entitled to the $2,500 at issue. *Id.* at 52, 818 A.2d at 1178. With respect to the second issue, the court concluded that Borzym's pleadings constituted an adequate demand for punitive damages and alleged facts that would support a claim of actual malice. *Id.* at 57, 818 A.2d at 1181. Thirdly, as to the amount of the punitive damages, the court identified evidence in the record that Darcars was profitable and financially sound and that the dealer sold over 1000 cars per year at prices ranging from $32,000 and $61,000. This evidence, the court held, was sufficient to support the "relatively modest" punitive damage award of $25,000. *Id.* at 58–59, 818 A.2d at 1182.

We granted Darcars' petition for a writ of certiorari, *Darcars v. Borzym,* 376 Md. 49, 827 A.2d 112 (2003), which presented the following questions:

1. Whether the Court of Special Appeals erred in holding that the evidence presented to support a conversion claim by a preponderance of the evidence was legally sufficient to support the finding of actual malice by clear and convincing evidence required for a punitive damages verdict?

2. Whether the Court of Special Appeals erred in holding that the substantive clear and convincing burden of proof applicable to punitive damages claims has no bearing on the Court's legal determination of the sufficiency of the evidence to support those claims?

3. Whether a defendant's ability to pay an award of punitive damages is an essential element of a plaintiff's claim for punitive damages in which the plaintiff bears the burden of proof and the plaintiff failed to meet that burden in this case?

We hold that the evidence presented at trial was sufficient to sustain a finding of actual malice. We further hold that, in determining the legal sufficiency of evidence supporting actual malice, a trial court must consider the "clear and convincing" standard of proof. Moreover, Borzym had no obligation to present evidence of Darcars' financial condition; therefore, the award of punitive damages stands.

## II. Discussion

### A. The Evidence is Sufficient to Support a Finding of Actual Malice

Darcars contends that the Court of Special Appeals erred in holding that the evidence presented in this case was sufficient to support a finding of actual malice by clear and convincing evidence. In Darcars' view, the evidence minimally supports a claim of conversion. Darcars asserts that there was absolutely no evidence that any of its actions were based on any evil motive, intent to injure, or fraud, and that, without more, the jury had to "speculate" or "guess" to reach the conclusion that the conversion had been motivated by actual malice. Darcars further takes issue with the Court of Special Appeals' reliance on Darcars' failure to raise defenses of "claim of right" or "honest belief" that it was entitled to the $2,500 down-payment, as it posits that such defenses are not necessary to avoid the imposition of punitive damages in a conversion claim.

In response to Darcars' arguments, Borzym argues that clear and convincing evidence of actual malice supports his claim for punitive damages. The tort of conversion, according to Borzym, has been committed with actual malice if the evidence shows that the defendant consummated the conversion willfully and with knowledge of the wrong. In Borzym's opinion, Darcars demonstrated knowledge of the wrongfulness of the conversion when its representative refused to return Borzym's belongings and stated, "[f]orget about it. Get out of here. Call your attorney. Get lost."

Conversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind. The physical act can be summarized as "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Allied Investment Corp. v. Jasen,* 354 Md. 547, 560, 731 A.2d 957, 963 (1999) (quoting *Interstate Ins. Co. v. Logan,* 205 Md. 583, 588–89, 109 A.2d 904, 907 (1954)). This act of ownership for conversion can occur either by initially acquiring the property or by retaining it longer than the rightful

possessor permits. As we explained in *Merchants' Nat'l Bank v. Williams*, 110 Md. 334, 351–52, 72 A. 1114, 1117 (1909):

> Conversion, in the sense of the law of trover, consists either in the appropriation of the property of another, or in its destruction, or in exercising dominion over it in defiance of the owner's rights, or in withholding the possession from him under an adverse claim of title, and all who aid, command, assist, or participate in the commission of such unlawful acts are liable.

Later, in *Wallace v. Lechman & Johnson, Inc.*, 354 Md. 622, 732 A.2d 868 (1999), we again discussed the types of acts that may give rise to a claim of conversion:

> [T]he gist of a conversion is not the acquisition of the property by the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled. Nor need there exist a forcible dispossession of property to constitute an act of the defendant a conversion. A conversion may consist of a wrongful, tortious or unlawful taking of property from the possession of another by theft, trespass, duress, or fraud and without his consent or approbation, either express or implied.

*Id.* at 633, 732 A.2d at 874 (quoting *Saunders v. Mullinix*, 195 Md. 235, 240, 72 A.2d 720, 722 (1950)). In this case, the jury found that Darcars' act of retaining Borzym's $2500 downpayment, laptop and music CDs amounted to an unlawful exercise of dominion over that property.

Besides the physical act of exerting unlawful control, there is an intent element to the tort of conversion, and a wide range of different states of mind qualify. At a minimum, a defendant liable of conversion must have "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 414, 494 A.2d 200, 208 (1985). The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property. For example, "[a] purchaser of stolen goods or an

auctioneer who sells them in the utmost good faith becomes a converter, since the auctioneer's acts are an interference with the control of the property." *Id.*

We have said that, when conversion occurs in these circumstances, punitive damages are not appropriate. *K & K Management v. Lee,* 316 Md. 137, 174–79, 557 A.2d 965, 983–85 (1989) (holding that, although the defendant was liable for conversion, punitive damages were unjustified because of an absence of actual malice); *Food Fair Stores, Inc. v. Hevey,* 275 Md. 50, 56, 338 A.2d 43, 47 (1975) (reversing an award for punitive damages where the defendant believed that it was entitled to the converted property and, therefore, committed the conversion without any evil or bad intention); *Siegman v. Equitable Trust Co.,* 267 Md. 309, 316, 297 A.2d 758, 761 (1972) (holding that the plaintiff was not entitled to punitive damages because the conversion occurred not out of an evil motive but as a result of the defendant's mistake of law).

Conversion, of course, also may occur when the defendant's intent reaches the level of "actual malice." *See Middle States Holding Co., Inc. v. Thomas,* 340 Md. 699, 702, 668 A.2d 5, 7 (1995); *K & K Management,* 316 Md. at 174–79, 557 A.2d at 983–85; *Food Fair Stores,* 275 Md. at 56, 338 A.2d at 47; *Siegman,* 267 Md. at 316, 297 A.2d at 761. We have held that, where a defendant commits a tort with "actual malice," a jury may award the plaintiff punitive damages. *Montgomery Ward v. Wilson,* 339 Md. 701, 736, 664 A.2d 916, 933 (1995); *Ellerin v. Fairfax Savings, F.S.B.,* 337 Md. 216, 241, 652 A.2d 1117, 1129 (1995); *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.,* 336 Md. 635, 652, 650 A.2d 260, 269 (1994); *Owens–Illinois v. Zenobia,* 325 Md. 420, 463, 601 A.2d 633, 654 (1992). Punitive damages are awarded "[based] upon the heinous nature of the defendant's tortious conduct," *Zenobia,* 325 Md. at 454, 601 A.2d at 649, and they serve the purpose of punishing the particular tortfeasor and deterring conduct similar to that which underlay the tort. *Id.; see Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 773–74, 752 A.2d 200, 246–47 (2000); *Bowden v. Caldor,* 350 Md. 4, 22, 710 A.2d

267, 276 (1998); *Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 537–38, 682 A.2d 1143, 1161 (1996).

In recent years, the law of punitive damages has undergone significant development. *See, e.g., Montgomery Ward,* 339 Md. at 736, 664 A.2d at 933; *Ellerin,* 337 Md. at 241, 652 A.2d at 1129; *Alexander & Alexander,* 336 Md. at 652, 650 A.2d at 269; *Zenobia,* 325 Md. at 463, 601 A.2d at 654. The leading case in this effort is *Owens–Illinois v. Zenobia,* in which Judge Eldridge, writing for the Court, made it clear that a jury may award punitive damages only when a plaintiff has demonstrated by clear and convincing evidence that the defendant acted with "actual malice." 325 Md. at 460, 601 A.2d at 652. We have defined the term "actual malice" as "conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud." *Id.*; *see Bowden,* 350 Md. at 23, 710 A.2d at 276; *Scott v. Jenkins,* 345 Md. 21, 33, 690 A.2d 1000, 1006 (1997); *Ellerin,* 337 Md. at 228–29, 652 A.2d at 1123. With respect to the clear-and-convincing standard of proof, we regarded it as "appropriate in the assessment of punitive damages because of their penal nature and potential for debilitating harm." *Zenobia,* 325 Md. at 469, 601 A.2d at 657.

Our opinions in recent punitive damage cases have examined the intent element of various torts, other than conversion, and defined the type of wrongful motive that may qualify as "actual malice." In *Zenobia,* this Court explained what is meant by "actual malice" in the context of products liability, emphasizing that "negligence alone, no matter how gross, wanton, or outrageous, will not satisfy [the] standard [of actual malice]." 325 Md. at 463, 601 A.2d at 654. Rather, evidence supports a finding of actual malice if it shows by clear and convincing evidence that the defendant made "a *bad faith* decision ... to market a product, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of the consumer." *Id.* (emphasis added).

In *Ellerin,* the Court considered the availability of punitive damages where the defendant had committed fraud. 337 Md. at 234, 652 A.2d at 1126. We examined whether fraud "inher-

ently involves the state of mind and conduct which is ordinarily required for the allowability of punitive damage." *Id.* at 229, 652 A.2d at 1123. We reemphasized that only evidence of "actual malice" supports an award of punitive damages: "Maryland law has limited the availability of punitive damages to situations in which the defendant's conduct is characterized by knowing and deliberate wrongdoing." *Id.* at 228, 233, 652 A.2d at 1123, 1125. Because one could commit fraud with only "reckless disregard" for the truth, we concluded that not all instances of fraud warrant the imposition of punitive damages. *Id.* at 235, 652 A.2d at 1126. Nevertheless, a plaintiff satisfies the element of "actual malice" and supports a punitive damage award when the evidence shows that the defendant committed fraud with "actual knowledge of falsity, coupled with [an] intent to deceive." *Id.* at 234, 652 A.2d at 1126.

In *Montgomery Ward,* a case involving the tort of malicious prosecution, we reaffirmed the notion that only evidence of "actual malice" supports an award of punitive damages. 339 Md. at 735–36, 664 A.2d at 933. We stated that, in a claim of malicious prosecution, punitive damages may be awarded only if there is clear and convincing evidence of "the defendant's wrongful or improper motive for instigating the prosecution" without probable cause. *Id.* It was not enough for the plaintiff in that case to present evidence only of a lack of probable cause, because that alone would allow a punitive damage award where there is an "inadequacy of investigation." *Id.* at 735, 664 A.2d at 933. "Inadequacy of investigation does not mean that [the defendant's] motive was anything other than bringing a thief to justice," a motive that does not equate to actual malice. *Id.*

Like in the context of products liability, fraud, and malicious prosecution, the availability of punitive damages for the tort of conversion depends on the intent of the tortfeasor. While a plaintiff may obtain a compensatory damage award by proving merely that the defendant, without bad faith, intended to exert unlawful dominion over the plaintiff's property, punitive damages may be awarded only if the defendant demon-

strated "actual malice" in carrying out the conversion. The term "actual malice" in the context of conversion requires little explanation beyond the definition we have established in our previous cases: consciousness of the wrongdoing or "conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud." *Zenobia*, 325 Md. at 460, 601 A.2d at 652; *see Bowden*, 350 Md. at 23, 710 A.2d at 276; *Scott*, 345 Md. at 33, 690 A.2d at 1006; *Montgomery Ward*, 339 Md. at 735–36, 664 A.2d at 933; *Ellerin*, 337 Md. at 228–29, 652 A.2d at 1123. Where the defendant converts property with a consciousness of the wrongfulness of that conversion, he or she possesses the requisite improper motive to justify the imposition of punitive damages.

The evidence presented in this case is sufficient to demonstrate that Darcars had an improper motive in converting Borzym's $2,500 cash down-payment, laptop, and music CDs. When Borzym met with Darcars employees to discuss the repossession of the BMW and to inquire about his down-payment, laptop, and CDs, a Darcars representative told him to "Forget about it. Get out of here. . . . [C]all your attorney" and "get lost." Darcars did not make the BMW available to Borzym to retrieve his belongings, and even after Borzym had left the dealership office, Darcars representatives continued their inappropriate behavior. Outside the office, when Borzym's father learned of his son's troubles and approached Darcars officials, they began sarcastically waving goodbye to the Borzyms, and one Darcars employee "cursed out" the father and son and accused them of being thieves.

Evidence of this conduct provides a sufficient basis for the jury's conclusion that Darcars representatives acted with actual malice in the unlawful retention of Borzym's property. The evidence of Darcars employees pretentiously dismissing Borzym's inquiries about his property, cursing, and then commenting, "get lost" and "call your attorney," suggests malice. That evidence, combined with evidence of the heated exchange between Darcars personnel and Borzym, certainly could lead to the conclusion that the conversion of the property was, in

effect, a retaliation for Borzym's failure to resolve the dispute on Darcars' terms. Accordingly, the evidence was sufficient to support the jury's finding of actual malice.

### B. Actual Malice Must Be Supported by Clear and Convincing Evidence

This Court's holding in *Zenobia* left no question as to what level of proof is required for a plaintiff to establish "actual malice" in support of a claim for punitive damages. A party seeking punitive damages must prove actual malice by "clear and convincing evidence." 325 Md. at 469, 601 A.2d at 657. As we stated in *Zenobia:*

> Use of a clear and convincing standard of proof will help to insure that punitive damages are properly awarded. We hold that this heightened standard is appropriate in the assessment of punitive damages because of their penal nature and potential for debilitating harm. Consequently, in *any* tort case a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages.

*Id.*

In the case now before us, after holding that the evidence in this case was legally sufficient to support a finding of actual malice, the Court of Special Appeals deviated from the central issues. It expressed the view that the "clear and convincing" standard of proof has no bearing on a court's determination of the sufficiency of the evidence supporting actual malice. Stated somewhat differently, it held that a trial judge should not consider the heightened standard in deciding whether a plaintiff had met the burden of production on the issue of actual malice, which, if met, would allow the question of actual malice to reach the jury. In the intermediate appellate court's view, "clear and convincing evidence" relates only to the burden of persuasion—the level of certainty at which *the jury* must be convinced that "actual malice" motivated the tort. Darcars argues that this holding contradicts precedent from both this Court and the United States Supreme Court. We agree.

The · Supreme Court case of *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), speaks most directly to this issue. *Anderson* involved a libel suit of the variety described in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), under which liability is established only upon a finding of "actual malice" by clear and convincing evidence. The inquiry before the *Anderson* Court was "whether the Court of Appeals erred in holding that the heightened evidentiary requirements that apply to proof of actual malice in this *New York Times* case need not be considered for the purposes of a motion for summary judgment." *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509, 91 L.Ed.2d at 211.

The Court discussed the analogous scenario of a motion for acquittal in a criminal case, where "the beyond-a-reasonable-doubt standard applies and . . . the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt." *Id.* at 252, 106 S.Ct. at 2512, 91 L.Ed 2d at 214. Comparing this to a decision to allow the question of "actual malice" to go to the jury, the Court stated that a trial judge should consider "whether a reasonable factfinder could conclude . . . that the plaintiff had shown actual malice *with convincing clarity.*" *Id.* (emphasis added). The Court explained:

> Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of the determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries its ultimate decision must fall,

and these standards and boundaries are in fact provided by the applicable evidentiary standards.

*Id.* at 254–55, 106 S.Ct. at 2513, 91 L.Ed.2d at 215–16. The Court also stated that the trial court must consider the "substantive evidentiary burden" at both the directed verdict and summary judgment stages. *Id.* at 255, 106 S.Ct. at 2514, 91 L.Ed.2d at 216. In summary, the Court stated:

> [A] court ruling on a motion for summary judgment must be guided by the *New York Times* "clear and convincing" evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity.

*Id.* at 257, 106 S.Ct. at 2514–15, 91 L.Ed.2d at 217.

Our cases support a conclusion consistent with *Anderson.* Recently, in *White v. State*, 363 Md. 150, 767 A.2d 855 (2001), we considered the sufficiency of the evidence supporting a conviction for cocaine possession in light of the beyond-a-reasonable-doubt standard of proof. The function in reviewing evidentiary sufficiency, we explained, is to "determine whether the verdict was supported by sufficient evidence, direct or circumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Id.* at 162, 767 A.2d at 862. Furthermore,

> [a]lthough a conviction may rest on circumstantial evidence alone, a conviction may not be sustained on proof amounting only to strong suspicion or mere probability.... [The evidence] must do more than raise the possibility or even the probability of guilt. It must afford the basis for an inference of guilt beyond a reasonable doubt.

*Id.* at 162–63, 767 A.2d at 862 (citations omitted). Based on these principles after reviewing the requirements for the crime of possession of cocaine, we reversed White's conviction because

> the circumstantial evidence upon which the State's case rested was insufficient as a matter of law to support, beyond

a reasonable doubt, that [White] exercised dominion or control over the cocaine.... Although [the evidence] might form the basis for a strong suspicion as to [White's] culpability, the evidence, and reasonable inferences drawn therefrom, does not reach the standard of guilt beyond a reasonable doubt.

*Id.* at 167, 767 A.2d at 864.

The test for sufficiency of the evidence in criminal cases, itself, demonstrates that the heightened standard of proof plays a part in the outcome of this legal determination. The test, as recited in *Wills v. State,* 329 Md. 370, 620 A.2d 295 (1993), is "whether the evidence either shows directly or supports a rational inference of the facts to be proved, from which a trier of fact could be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged." *Id.* at 376, 620 A.2d at 297 (quoting *Wilson v. State,* 261 Md. 551, 564, 276 A.2d 214 (1971)). It appears from this formulation that more facts are needed for a judge to find evidentiary sufficiency under this test than where a claimant needs proof merely by a preponderance of the evidence to show, for instance, civil negligence. Thus, contrary to the opinion of the Court of Special Appeals, the burden of production fluctuates depending on the burden of persuasion in a given case.

▮▮▮▮▮ Because meeting the burden of production requires different quanta of evidence depending on the burden of persuasion, a judge must account for and consider the appropriate burden of persuasion in deciding whether to allow the jury to decide an issue. A judge must not let the jury decide a criminal defendant's guilt if the evidence could not establish that the elements have been met beyond a reasonable doubt. A judge must grant a civil defendant's motion for judgment as a matter of law if the plaintiff failed to present evidence that could persuade the jury of the elements of the tort *by a preponderance of the evidence.* Likewise, a judge must not allow the jury to consider the issue of "actual malice" unless the evidence could establish "actual malice" *clearly and convincingly.*

When discussing punitive damages, this Court has taken the position that a determination of evidentiary sufficiency of actual malice requires consideration of the "clear and convincing" standard. In *ACandS, Inc. v. Godwin*, 340 Md. 334, 388, 390, 667 A.2d 116, 142–43 (1995), we affirmed the trial court's determination that plaintiffs had not presented sufficient evidence of "actual malice" to allow the jury to consider the issue. The plaintiffs, victims of asbestos-related disease, had prevailed in their personal injury and wrongful death claims for compensatory damages against ACandS, Inc., an insulation contractor. *Id.* at 345, 667 A.2d at 121. The plaintiffs argued that punitive damages were warranted because the defendant acted with "actual malice" by marketing products containing asbestos in "bad faith." *Id.* at 387, 667 A.2d at 141–42. Following our review of the evidence of bad faith, we stated that the "variety of inferences" drawn from that evidence "prevents [it] from rising to the clear and convincing standard of required for a finding of bad faith marketing." *Id.* at 388, 667 A.2d at 142. Clearly considering the heightened burden of persuasion required for proving "actual malice," we concluded that "[t]here is a want of clear and convincing evidence that ACandS marketed asbestos products in bad faith, knowing of the danger to bystanders, and in conscious or deliberate disregard of the threat to the safety of bystanders." *Id.* at 390, 667 A.2d at 143.

In a related asbestos case, *ACandS, Inc. v. Asner*, 344 Md. 155, 686 A.2d 250 (1996), we again relied on the "clear and convincing" standard in rejecting the plaintiffs' claims of punitive-damage liability. In *Asner*, we reviewed the trial judge's decision to submit the issue of punitive damages to the jury. *Id.* at 161, 686 A.2d at 253. Because most of the evidence presented in *Asner* was exactly the same as that which the Court reviewed in *Godwin*, we held that it was insufficient to send to the jury. *Id.* at 182, 686 A.2d at 263. The additional punitive-damage evidence presented did "not substantially assist the plaintiffs in reaching the clear and convincing standard" for "actual malice." *Id.* at 184, 686 A.2d at 264. Moreover, the plaintiffs' analysis of the evidence had no merit

because it "ignore[d]" the requirement that "actual malice" "be proven by clear and convincing evidence." *Id.* at 186, 686 A.2d at 265.

*Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 537–51, 682 A.2d 1143, 1161–68 (1996), provided us with another occasion to review whether certain evidence was sufficient to allow the plaintiffs' claims for punitive damages to reach the jury. Like in *Godwin* and *Asner,* the "clear and convincing" burden of persuasion guided our determination that the question of "actual malice" should not have reached the jury. We stated: "On the record before us, . . . we cannot say that the evidence of actual malice was legally sufficient under a clear and convincing evidentiary standard to submit the question of punitive damages to the jury." *Id.* at 551, 682 A.2d at 1168.

These punitive-damage cases are consistent with this Court's review of the evidentiary sufficiency in fraud cases, where liability must be proven by clear and convincing evidence. *See VF Corp. v. Wrexham Aviation Corp.,* 350 Md. 693, 715 A.2d 188 (1998). In *VF Corp.,* we held: "Our review of the record convinces us, particularly in light of the 'clear and convincing' standard of proof, that there was insufficient evidence of either the knowledge element or the intent to deceive element for the tort count to have been submitted to the jury." *Id.* at 706, 715 A.2d at 194. The heightened standard of proof, therefore, affected our legal determination of evidentiary sufficiency.

Our conclusion that the "clear and convincing" standard influences the determination of the evidentiary sufficiency of "actual malice" should not be construed to minimize the role of the jury. As the Supreme Court stated in *Anderson:*

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. [We do not] suggest that the trial courts should act other than with

caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216 (citations omitted). Nevertheless, when called upon to decide the sufficiency of the evidence in support of an award of punitive damages, judges must consider that the claimant must prove "actual malice" by clear and convincing evidence. Notwithstanding our disagreement with the Court of Special Appeals on this issue, we do concur with that court's judgment, as we discussed in Part A, *supra*, that the evidence presented in this case was sufficient to support a finding of actual malice.

### C. Plaintiff Has No Burden to Present Evidence of a Defendant's Financial Condition

Darcars further argues that the jury and trial court could not make an informed determination as to the appropriate amount of punitive damages, because Borzym did not present sufficient evidence of Darcars' financial condition or ability to pay. According to Darcars, Borzym had a burden to present clear and convincing evidence not only that Darcars was liable for punitive damages, but also that Darcars had the financial ability to pay the punitive damage award.

Borzym counters that the jury awarded punitive damages based on "competent evidence" of Darcars' financial condition. In addition, Borzym maintains that the punitive damage award of $25,000 was not excessive and was reasonably calculated as a deterrent.

 Courts currently allow, but do not compel, a plaintiff to present evidence of a defendant's financial condition. Where the plaintiff seeks punitive damages, the trial court, may elect, but is not required, to bifurcate the trial so that the jury determines compensatory claims separate from the claim of punitive damages. *Zenobia,* 325 Md. at 473–74 n. 29, 601 A.2d 633, 659 n. 29. In *Zenobia,* we described this practice, which trial courts frequently employ in light of Maryland

Code, § 10–913(a) of the Courts and Judicial Proceedings Article (1974, 2002 Repl. Vol.) (prohibiting the admission of evidence of the defendant's financial means in personal injury actions unless the jury has found first that "punitive damages are supportable under the facts"): "[T]he trial court will instruct the jury on the compensatory claims and on the defendant's potential liability for punitive damages. Then, once the jury has made a finding of liability for punitive damages, the trial court will further instruct the jury concerning the calculation of a punitive damage award." *Id.* We stated plainly in *Zenobia,* however, that the bifurcated procedure is not mandatory:

> If there were two separate damages trials in every case, much of the evidence at the trial solely on the issue of punitive damages would duplicate the evidence admitted at the compensatory damages trial. Many of the same witness would have to be recalled to repeat their testimony before the jury. In light of the fact that this duplication would burden both witnesses and jurors as well as waste judicial resources, we believe that mandatory bifurcation is undesirable.

*Id.*

Although this bifurcated procedure is not required, the general practice has been to withhold evidence of a defendant's ability to pay punitive damages "until and unless the jury awards compensatory damages and decides to award punitive damages." *Montgomery Ward v. Wilson,* 101 Md. App. 535, 551, 647 A.2d 1218, 1226 (1994), *rev'd on other grounds,* 339 Md. 701, 664 A.2d 916 (1995); *see Cole v. Sullivan,* 110 Md.App. 79, 86, 676 A.2d 85, 89 (1996). In describing the rationale behind this practice, the Court of Special Appeals stated:

> When and if the jury awards compensatory damages, then the trial judge can instruct fully on punitive damages after the presentation of evidence of the defendant's ability to pay. There is but one jury and one trial, although the presentation of financial evidence is delayed until the appro-

priate time. Thus, the trial truly is not divided into two parts, and witnesses need not be recalled.

*Id.* at 551, 647 A.2d at 1226. Once liability for punitive damages has been established, however, "evidence of a defendant's ability to pay punitive damages should be considered." *Id.* at 550, 647 A.2d at 1226.

 Our cases have never *required* clear and convincing evidence of a defendant's financial condition to support an award of punitive damages. In *Bowden,* we made clear that evidence of a defendant's financial condition is relevant in determining whether a jury's award of punitive damages is excessive. *Bowden,* 350 Md. at 28–29, 710 A.2d at 278–79. We identified nine "legal principles or considerations which should guide a trial court in determining if a punitive damage award is excessive." *Id.* at 25–26, 27–41, 710 A.2d at 277, 278–85. Among the nine factors, we included the requirement that the "amount of punitive damages 'should not be disproportionate to . . . the defendant's ability to pay.'" *Id.* at 28, 710 A.2d at 278. In describing this factor, we recognized that "[t]he purpose of punitive damages is not to bankrupt or impoverish a defendant." *Id.*

We were clear, however, that the factors are not criteria that must be established but, rather, guideposts to assist a court in reviewing an award. As to the nine principles or factors, we said "not all . . . are pertinent in every case involving court review of punitive damage awards." *Id.* at 41, 710 A.2d at 285. In addition, the nine principles are "not intended to be exclusive or all-encompassing," and "[o]ther principles may appropriately be applicable to judicial review of punitive damages awards under particular circumstances." *Id.*

Sound reasoning supports our view that a plaintiff has no obligation to establish a defendant's ability to pay punitive damages. Compelling a plaintiff seeking punitive damages to present evidence of a defendant's financial condition could, on the one hand, require a plaintiff with limited financial resources to wage a complicated discovery campaign against a

monetarily sated defendant. On the other hand, it would license the plaintiff to conduct extensive pre-trial discovery of the defendant's finances to support a measure of damages that may never be awarded. Not only could the latter result in a severe invasion of the defendant's privacy, but it could also unnecessarily cost the defendant a great deal of time and money to compile all of its financial information.

 Moreover, placing a burden on plaintiff to introduce evidence of a defendant's financial condition will enhance the risk that a jury will place undue emphasis on the defendant's wealth. If that should occur, the jury may become more prone to use information of a wealthy defendant's finances to justify an award of punitive damages disproportionately higher than the gravity of the defendant's wrongdoing. As we stated in *Bowden*, "merely because a defendant may be able to pay a very large award of punitive damages, without jeopardizing the defendant's financial position, does not justify an award which is disproportionate to the heinousness of the defendant's conduct." 350 Md. at 28, 710 A.2d at 279.

 Based on these reasons, we see no reason to alter the way in which evidence of a defendant's ability to pay is presented. Consequently, a plaintiff does not bear a burden to present evidence of a defendant's financial condition in support of its pursuit of punitive damages. Our approach comports with the significant number of other jurisdictions that have addressed the issue. *See, e.g., Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 373 (2nd Cir.1988) ("The incompleteness of the record as to [the defendant's] net worth is not a basis for reducing the punitive damages award against him . . . ."); *Tolliver v. Amici,* 800 F.2d 149, 151 (7th Cir.1986) (rejecting the argument that a punitive damages award should be reversed because the plaintiff failed to introduce sufficient evidence of the defendant's net worth); *Evans v. Thompson,* 762 P.2d 754, 754–55 (Colo.App.1988) (observing that evidence of a defendant's financial condition is not a "prerequisite to an award of exemplary damages"); *Rinaldi v. Aaron,* 314 So.2d 762, 765 (Fla.1975) (holding that "evidence of [a defendant's

financial] worth is not a requisite to [a punitive damage] award"); *Wilson v. Colston,* 120 Ill.App.3d 150, 75 Ill.Dec. 600, 457 N.E.2d 1042, 1044 (1983) (holding that a plaintiff "may obtain an award for [punitive] damages without introducing evidence of the defendant's monetary resources"); *Nugent v. Kerr,* 543 N.W.2d 688, 691 (Minn.Ct.App.1996) (stating that "evidence of a defendant's financial condition ... is not necessarily an essential element to prove entitlement to [punitive] damages"); *Wagner v. McDaniels,* 9 Ohio St.3d 184, 459 N.E.2d 561, 564 (1984) (stating that evidence of a defendant's net worth is not required before punitive damages may be awarded); *Anderson v. Latham Trucking Co.,* 728 S.W.2d 752, 754 (Tenn.1987) ("[T]he plaintiff or the defendant ... *may* offer proof of the financial condition of a defendant, ... but it is not essential or mandatory that the record contain any such evidence to sustain an award of punitive damages."); *Hall v. Wal–Mart Stores, Inc.,* 959 P.2d 109, 112 (Utah 1998) (declining to adopt a rule requiring the plaintiff to present evidence of the defendant's relative wealth as a prerequisite to an award of punitive damages); *Fahrenberg v. Tengel,* 96 Wis.2d 211, 291 N.W.2d 516, 527 (1980) ("Failure to show net worth does not invalidate the award of punitive damages, but eliminates one factor by which the reasonableness of the award can be gauged.").

 The Circuit Court applied the correct procedures in this case. After the jury found Darcars liable for compensatory damages and that Borzym was entitled to punitive damages, the Circuit Court allowed Borzym to present evidence regarding the amount of punitive damages. During this phase of the trial, Borzym, for the first time, elicited testimony relating to Darcars' financial condition and argued that it was able to pay $500,000 in punitive damages. Darcars offered no evidence during that part of the proceedings. The judge then instructed the jury according to Section 10:12 of the Maryland Civil Pattern Jury Instruction. The jury determined, specifically, that Darcars converted Borzym's property with actual malice and, as a result, Borzym was entitled to punitive damages of $100,000, which the trial court later reduced to

$25,000. Borzym had no obligation to establish that Darcars had the financial ability to pay the award. Consequently, we shall affirm the award of punitive damages.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.*