886 A.2d 924

Arie ROZEN et al.

v.

Michal GREENBERG.

No. 1990, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Oct. 7, 2005.

Reconsideration Denied Dec. 15, 2005.

Alan B. Sternstein (Shulman, Rogers, Gandal, Pordy & Ecker, P.A., on brief), Rockville, for appellant.

Jeffrey M. Schwaber (Stein, Sperling, Bennett, DeJong, Driscoll & Greenfeig, P.C., on brief), Rockville, for appellee.

Panel DAVIS, KENNEY and SHARER, JJ.

DAVIS, J.

In 2001, appellant, Arie Rozen, told appellee, a Montgomery County woman named Michal Greenberg, that he "head[ed]" a

tax preparation business in Rockville, Maryland, called Taxido, Inc., and appellant proposed to merge Taxido with appellee's tax preparation business, which was also based in Rockville. Rather than merging, appellee sold her client list to appellant in exchange for a share of the income he generated from preparing those clients' returns. The parties' relationship soon deteriorated, as they disputed their obligations under their contract of sale.

Appellee ultimately sued appellant and Taxido in the Circuit Court for Montgomery County, alleging that appellant fraudulently induced her to sell her business by misrepresenting his background. After a four-day bench trial, judgment was entered for appellee on her fraud claim, and she was awarded $368,760 in damages as well as rescission of the contract to sell her business.[1] Appellant noted this appeal, presenting three questions for our review:

I. Was the trial judge clearly erroneous in finding that appellant's misrepresentations were material to appellee's decision to sell her business to appellant?

II. Was the trial judge clearly erroneous in finding that appellee reasonably relied on appellant's misrepresentations?

III. Did the trial judge err in calculating damages based on appellee's projected gross revenues, as opposed to her projected income?

We answer the first two questions in the negative, but, because the trial judge erred in his decision on damages, we shall vacate that judgment and remand the case for further proceedings.

## BACKGROUND

Appellee's Rockville-based business consisted of preparing U.S. tax returns for Israelis. Appellee worked as a sole

---

1. Appellant does not challenge the propriety of awarding both damages and rescission. *See Sonnenberg v. Sec. Mgmt. Corp.,* 325 Md. 117, 124–25, 599 A.2d 820 (1992) (holding that the remedies are exclusive).

practitioner, residing in Israel most of the year, but traveling to the United States annually to perform her work here. She had been an accountant for nearly twenty years and, by 2001, she had nearly 700 clients.

Appellant was not acquainted with appellee in 2001, but he sent her the following e-mail on November 9 of that year:

> My name is Arik Rozen and I am heading a TAX PREPA-RATION SERVICE for Israelis in the US.
>
> The service is based in Rockville, MD and we are focusing on the DC area, Boston, and NY. You can find more info at www.taxido.com. We have a powerful website which supports on-line preparation from any where [sic] in the US.
>
> I understand that you have been doing something similar in the last few years. Since I have always believed in joining forces I am writing to you to see if you are interested in cooperating and if so on which level. I truly believe that we can benefit greatly by working together instead of competing.
>
> I am looking forward to discussing the opportunity with you.
>
> Sincerely,
>
> Arik Rozen, CPA

At trial, appellee testified that one of the reasons she found appellant's e-mail so intriguing was that it seemed that his business comprised a team of several professionals, whereas she had always been a sole practitioner. She testified:

> ... I all the time worked on my own, I never had any assistant or any employee and it was very interesting that there is here somebody who owns a company or have a business that many people are working for him, and it seems interesting.

Appellee testified that, after receiving the e-mail, she visited Taxido's website. Her trial testimony regarding the website was as follows:

> Q And what did you see when you went to the website?

A When I went to the website I saw first of all About Us, that was the most interesting part for me and there I saw that—

Q When you say About Us, what do you mean when you say you saw About Us? Was that a heading on the website?

A Yes. Yes.

Q Okay. And what did you see under the heading About Us?

A Under the heading I saw that this company is serving I don't know, I didn't know what entity it was, it said Taxido, and this entity is serving is specializing in foreigners and Israelis, there was a clause about it, that they are trying to serve their clients very well and many things, and then there was a heading Team and under the Team it says that they are account, tax professionals, accounts, supervised by CPA and leading of the team is Aric Rozen or Arie Rozen, I don't remember exactly how he pronounced his name there, who is having an accounting degree MBA from Harriett College U.K. and he is a very, he is experienced for years in some financing position and for years as a CPA, that's what I thought, that's what I saw there.

Appellee then replied to appellant's e-mail, expressing her interest in discussing his proposal and inviting him to call her. At trial, she recounted their initial conversation, in which her primary concern was appellant's level of experience:

Q What did he say when he called you?

A He told me that he is very experienced, that he has many people working for him, that he specialized in Israelis and foreigners and he knows very well the law, and he praised himself about his experience, how good he is, how excellent he is and he says to me will you consider partnership and I'll never want a partner. And he said why and I said I don't believe that I can be in Israel coming for three months and that will work, and so that I remember very well.

And then he said how about you giving me your clients. I said let's talk about it. He said I'm very familiar, I did it [sic] few times before, I can send you a contract.

Q  Okay. Let me stop you right there. Why did you say let's talk about it? Why were you interested in continuing that dialogue?

A As I told you, I didn't think of selling at that point, in particular, I didn't advertise, or thought, I mean, I had thought about how to retire.

Q  Okay.

A I thought that I would like to retire at some point in time, but I need somebody very special to give my clients to him because I have a niche.

Q  Okay. Had you ever received offers similar to this, prior to this occasion?

A I received offers from CPAs like one from Philadelphia, one from California before, and, in particular, the year before, just a year before, I received an offer from a client of mine who is a CPA in Israel and was about to take his exams in the United States, and he called me and he said to me that he is very interested to talk to me, how we can cooperate and I went to meet him in New York. I met him in New York and we discussed the issues and then I decided to decline it because he didn't have enough experience.

Appellant told appellee that he was licensed as a CPA in Virginia and, to verify appellant's statements, appellee contacted that State's licensing authority to confirm appellant's good standing. She said that she relied on appellant's representation on his website that he had been a CPA for "many years," and she did not ask the licensing authority how long appellant had been licensed.

Appellant then sent appellee a contract offering to buy her client list. Appellee told appellant, "I am not going to sign with you anything in the world unless I see you in person and I see your business." She testified that, by referring to his

"business," she meant Taxido, the firm boasting of its team of "accountants, CPAs and Arie Rozen ... leading over the team." Appellee traveled to the United States to meet appellant in Rockville and to see Taxido's office.

Appellant met appellee at the home of appellee's friend, where appellee stayed when she was working in the U.S. Appellant then said, "let me show you my business," and proceeded to drive appellee, not to Taxido, but to C–Biz, an office in Northern Virginia where appellant was employed to prepare tax returns for clients of C–Biz. Appellee was impressed by C–Biz's facilities, which she mistook for Taxido. She soon agreed to sign appellant's contract.

In reality, appellant had only been a CPA for about five weeks when he first e-mailed appellee. He did not really have a business called Taxido. His nonexistent business had no clients and no "team" of professionals. Once their relationship deteriorated due to other disputes, which we need not recount here, appellee sued appellant, seeking both damages and rescission. She alleged that appellant's material misrepresentations induced her to enter into the contract to sell her business.

The trial court found that the misrepresentations in appellant's e-mail were indeed material, in that he had no such business as Taxido, no clients, and no team of professionals; at the time, Taxido was, at most, just appellant's idea for a business. The court also found that appellant misled appellee into believing that C–Biz was Taxido. Appellee, the court concluded, reasonably relied on these material misrepresentations in deciding to sell her business to appellant.[2] Judgment

---

**2.** In his decision, announced from the bench at the end of the case, the trial judge stated, *inter alia:*

. I recognize the burden that exists in determining whether or not there was fraud in the inducement and in evaluating the evidence in this case, and the testimony, and weighing the credibility of the witnesses, and what has transpired, I am convinced that there was fraud in the inducement in the creation of this contract and the execution of this contract. I believe that the evidence is clear and convincing that there

was entered in appellee's favor for $368,760, and the court ordered that the contract be rescinded.

## LEGAL ANALYSIS

▪▪▪▪ The tort of fraudulent inducement "means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment." *Sec. Constr. Co. v. Maietta*, 25 Md.App. 303, 307, 334 A.2d 133 (1975); *see also* Paul Mark Sandler & James K. Archibald, *Pleading Causes of Action in Maryland* §§ 3.25–3.26 (2004). The elements of civil fraud based on affirmative misrepresentation are that:

(1) the defendant made a false representation to the plaintiff,

(2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth,

(3) the misrepresentation was made for the purpose of defrauding the plaintiff,

(4) the plaintiff relied on the misrepresentation and had the right to rely on it, and

---

was reasonable reliance by Ms. Greenberg on material misrepresentations made by the defendant, as well as Taxido, Inc., to her detriment.

The lies begin with the heading of a tax preparation service for Israelis in the United States contained within the e-mail. They continue on with the location of the service, identifying the people involved as more than one, focusing on the D.C. area, Boston and New York. By the defendant's own admission, he had no actual clients at that time. The defendant had prepared no tax returns as of November 9, 2001 and there was no team that existed that would support this tax preparation service.

The lies continued with the representations that were made and the impressions that were made when Ms. Greenberg came over to conduct a meeting with the defendant. Unfortunately for Ms. Greenberg, she is not sophisticated in the sale of a business or in the conduction [sic] of a referral relationship and she entered into an agreement that reflects that lack of sophistication. However, she operated in good faith under that agreement, as evidence by her e-mails and her referrals and where it starts to unravel for the defendant is frankly his greed.

█ the plaintiff suffered compensable injury as a result of the misrepresentation.

*Hoffman v. Stamper*, 385 Md. 1, 28, 867 A.2d 276 (2005).

## I

█ Not all misrepresentations are actionable. To be actionable, misrepresentations must be material to the transaction at issue, either because it would be material to reasonable people generally or because it was material to the plaintiff. *Sass v. Andrew*, 152 Md.App. 406, 429, 832 A.2d 247 (2003). This materiality component of the tort is rooted in the fourth element, requiring that the plaintiff justifiably relied on the misrepresentations. *Id.* at 430, 832 A.2d 247; *see also Restatement (Second) of Torts* § 538 cmt. a (1977).

█ Appellant argues that the trial judge was clearly erroneous in finding that his level of experience and Taxido's resources were material to appellee's decision to sell her business. The argument is the equivalent of saying that appellee failed to meet her burden of production, and our task, therefore, is to review the record to see whether appellee adduced any evidence, however slight, from which the trial judge, applying the "clear and convincing" standard of proof applicable to fraud actions, could find in favor of appellee on the elements of her claim. *Hoffman*, 385 Md. at 16, 867 A.2d 276; *Darcars Motors of Silver Springs, Inc. v. Borzym*, 379 Md. 249, 267–73, 841 A.2d 828 (2004). In performing this task, we are bound by the mandate of Maryland Rule 8–131(c):

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, ***and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.***

(Emphasis added.)

█ Appellant bases his argument on numerous facts that, he contends, conflict with the finding that his experience and Taxido's resources were material to appellee's decision. For

example, he points out that appellee "never testified that she asked for Mr. Rozen's resume, recommendations letters or any other references before entering into the Agreement." We decline to tediously address each of his points because the entire argument runs contrary to our standard of review under Rule 8–131: "We do not evaluate conflicting evidence but assume the truth of all evidence, and inferences fairly deducible from it, tending to support the findings of the trial court and, on that basis, simply inquire whether there is any evidence legally sufficient to support those findings." *Mid South Bldg. Supply of Maryland, Inc. v. Guardian Door and Window, Inc.*, 156 Md.App. 445, 455, 847 A.2d 463 (2004); *see also Liberty Mut. Ins. Co. v. Maryland Automobile Ins. Fund*, 154 Md.App. 604, 609–10, 841 A.2d 46 (2004).

Upon our review, we find adequate evidence to support the trial judge's findings that appellant's misrepresentations as to his experience and Taxido's resources were material to appellee's decision to transfer her nearly 700 clients to appellant. It suffices, even on a clear and convincing evidentiary standard, merely to point out that appellee testified that only a year before appellant's offer she had rejected a similar offer "because he didn't have enough experience," and that appellee testified that she would not sign appellant's contract without seeing him and Taxido in person. Clearly, without a buyer armed with adequate experience and resources to serve her clients' needs, appellee was unwilling to give up control of her business. She testified, "I need somebody very special to give my clients to him because I have a niche." Appellant misrepresented to appellee that he had "years" of experience as a CPA, and that he was already, at that time (and not some time in the future), leading a team of professionals at Taxido. Appellant said "let me show you my business," and then led appellee to believe that C–Biz was Taxido. These "facts" were critical to appellee's decision, and, as illustrated by the offer she had previously rejected and her unwillingness to sell without visiting Taxido, experience was the *sine qua non* of her decision. We would be arrogating ourselves to the role of a factfinder if we concluded otherwise.

## II

Next, appellant argues that appellee had no right to rely on his misrepresentations—neither as to his experience nor as to Taxido's resources—because, had she investigated further, she could have easily discovered the truth before entering into the contract to sell her business. For example, he argues that "had Ms. Greenberg simply also asked the Virginia licensing authority for how long Mr. Rozen had been a CPA when she took the simple step of calling to find out whether he was certified, she would have obtained information at odds with Mr. Rozen's alleged misrepresentation...." As appellee points out, however, Maryland law imposes no such burden to investigate.

Maryland law is generally consistent with § 540 of the *Restatement (Second) of Torts:* "The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." *See Gross v. Sussex,* 332 Md. 247, 264–69, 630 A.2d 1156 (1993); *Schmidt v. Millhauser,* 212 Md. 585, 592–93, 130 A.2d 572 (1957). The exception to this general rule arises when, "under the circumstances, the facts should be apparent to [a person of the plaintiff's] knowledge and intelligence from a cursory glance or he has discovered something which should serve as a warning that he is being deceived...." *Id.* (quoting W. Page Keeton *et al., Prosser & Keeton, on the Law of Torts* § 108 at 752 (5th ed.1984)).

As with issue I, *supra,* we are again bound by Rule 8–131(c) to "assume the truth of all evidence, and inferences fairly deducible from it, tending to support the findings of the trial court and, on that basis, simply inquire whether there is any evidence legally sufficient to support those findings." *Mid South Bldg. Supply of Maryland, Inc.,* 156 Md.App. at 455, 847 A.2d 463. Here, appellee conducted more of an investigation than the law required; she was, after all, entitled to rely on appellant's representations. Appellant argues, however,

that the law required her to delve deeper, simply because, had she done so, she would have discovered the truth.

As a warning sign alerting appellee that she was being deceived and should have investigated further, appellant points out that, although he had told her that Taxido was based in Rockville, when he said "let me show you my business," he drove her to Northern Virginia, where C–Biz was located; leaving Rockville and crossing state lines should have raised her suspicions, appellant argues. Appellee testified, however, that she "didn't really pay attention to the roads or anything. . . ." The inference to be drawn from these facts, which appellant views as being in conflict, was the prerogative of the trial judge sitting as factfinder; it is not our role to second guess his reasonable conclusions. The trial judge could reasonably have concluded that, to appellee, who primarily resided in Israel but visited Rockville for a few months every year during tax season, the drive from her friend's Rockville home to nearby C–Biz was not a warning sign. Moreover, in a case, such as the case at hand, where, as the trial judge concluded, appellant intentionally sought to deceive appellee, the law imposes no duty on her to, in effect, become a sleuth attempting to ferret out wrongdoing.

Similarly, the fact that appellee did not see any signs for "Taxido" when she visited C–Biz need not have been, as a matter of law, such a warning sign. Appellee testified that she did not see signs either for C–Biz or Taxido, and that when they entered C–Biz's offices, appellant introduced her to more than one secretary, then took her to his office where they talked. Appellant has not referred us to any sufficient reason to disturb the trial judge's factfinding.

### III

▆▆▆▆ The trial judge did err, however, in making a damages award. Appellee's damages expert based his opinion on appellee's gross income from 2001 (for preparing her clients' 2000 tax returns). Although the expert extracted from the actual 2001 gross income the revenue generated from

those clients who chose to remain with appellee rather than appellant, he never reduced the gross income figure by the expenses required to generate that income, to arrive at appellee's lost profit. This deficiency was the primary focus of appellant's cross-examination of the expert, and appellant argued to the trial judge in closing that, because the figures did not factor out expenses, they were unreliable. Appellant has not cited, and we have not located, any Maryland case directly on point, but the necessary remedy is a remand for a calculation of appellee's expenses, to arrive at a proper damages award. *See Guzman v. Jan–Pro Cleaning Sys., Inc.*, 839 A.2d 504, 508–09 (R.I.2003).

**JUDGMENTS OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED IN PART AND RE-VERSED IN PART; CASE REMANDED TO THE TRIAL COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID TWO–THIRDS BY APPELLANT AND ONE–THIRD BY APPELLEE.**