847 A.2d 463

**MID SOUTH BUILDING SUPPLY OF MARYLAND, INC.**

v.

**GUARDIAN DOOR AND WINDOW, INC.**

**No. 396, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

April 16, 2004.

446

Christopher C. Fogleman (Patricia L. Morse, Gleason, Flynn, Emig & Fogleman, Chartered, on the brief), Rockville, for Appellant.

Richard I. Chaifetz, Columbia, for Appellee.

Panel: HOLLANDER, CLAYTON GREENE, JR.,* PAUL E. ALPERT, (Ret., specially assigned), JJ.

---

* Greene, J., now a member of the Court of Appeals, participated in the conference and decision of this case while a member of this Court; and participated in the adoption of this opinion as a member of this Court by special designation.

PAUL E. ALPERT, Judge (Ret., specially assigned).

Appellant, Mid South Building Supply of Maryland, Inc. ("Mid South"), is a Maryland corporation engaged in the business of selling building supplies and materials. In addition to its principal place of business in Beltsville, Mid South has a facility in Baltimore that it acquired in 1999 when it purchased the assets of United Wholesale. Mid South sells security storm doors. It purchases the storm doors from a Philadelphia company known as Guida, Inc. Guida makes and sells security storm doors under the name "Guardian Security Storm Doors."

Appellee, Guardian Door and Window, Inc. ("Guardian"), is also a Maryland corporation with its principal place of business in Beltsville. Guardian and its predecessors have been in the business of manufacturing, selling, and installing doors, storm doors, and security door systems in Maryland, Virginia, and the District of Columbia since 1988. Guardian has sold security storm doors under the name "Guardian Security Storm Door" since 1988.

On December 15, 2000, Mid South filed in the Circuit Court for Prince George's County a complaint against Guardian for breach of contract. Guardian filed a counterclaim, and eventually an amended counterclaim, against Mid South alleging trademark infringement.

Mid South's complaint was tried first. In a bench trial, the court found that Guardian had failed to pay for goods it had purchased on credit from Mid South, and awarded Mid South $54,358.05 in principal, plus prejudgment interest totaling $31,346.35, and attorney's fees totaling $22,039.78. The circuit court then certified that judgment as final under Md. Rule 2–602(b). In an unreported opinion, we affirmed the circuit court's judgment. *Guardian Door & Window, Inc. v. Mid South Building Supply of Maryland, Inc.*, No. 1768, Sept. Term 2002 (filed September 17, 2003) (*Guardian I*).

A bench trial was held on the amended counterclaim on August 21 and October 16, 2002. At the close of the evidence, the court heard arguments from counsel and then asked the

parties to submit memoranda addressing the legal issues that had arisen during the course of the trial.

By order dated January 14, 2003, the circuit court "adopted as its own the Proposed Findings of Fact and Conclusions of Law of Guardian Door & Window, Inc. (except on the issue of damages as it may relate to counter-claimant's lost profits which the Court considers excessive under the unique circumstances of this case)." The court found that Mid South infringed upon Guardian's trademark by selling security storm doors not made by Guardian under the name "Guardian Security Storm Doors." The court ordered that judgment be entered in favor of Guardian in the amount of $45,990.33, an amount equal to "three times the counter-defendant's profits from the sale of the subject doors." The court also enjoined Mid South from selling security storm doors not made by Guardian Door which bear the name or mark "Guardian Security Storm Door." Mid South filed a motion to alter or amend the judgment, and the court denied the motion. This timely appeal followed.

### Issues Presented

Mid South presents two issues for our consideration:

I. Whether the trial court clearly erred in finding that Mid South infringed Guardian's trademark; and,

II. Whether the trial court clearly erred in determining Guardian's damages.

### Factual Background

Since at least 1996, Mid South has purchased security storm doors from Guida, Inc. of Philadelphia, Pennsylvania. Guida makes and sells security storm doors under the name of "Guardian Security Storm Doors." Between June 1, 1999, and August 29, 2001, Mid South purchased one hundred fifty-six storm doors from Guida, Inc., all of which were sold by Mid South to its customers.

On July 2, 1998, the State of Maryland issued to Guardian a certificate registering the trademark "GUARDIAN SECURI-

TY STORM DOOR" for a duration of ten years. On May 23, 2000, the United States Patent and Trademark Office issued to Guardian a certificate of registration for the mark "A GENUINE GUARDIAN SECURITY STORM DOOR," also for a duration of ten years.

In early April 2000, Patrick Toler, an employee of Guardian, observed on display at Mid South's Beltsville, Maryland location, brochures for Guardian storm doors. He took some of the brochures and gave them to his brother, Christopher Toler, the president of Guardian. Subsequently, Christopher Toler met with Mid South's Vice President, Daniel J. Flynn, and advised him that Mid South was infringing on Guardian's trademark.

At trial, Christopher Toler testified that Flynn stated that he was not aware of the infringement and that Mid South had purchased United Wholesale and he was not sure what they were selling. Flynn agreed to stop selling the doors.

Flynn testified at trial that the brochures and some Guardian Doors were on display for approximately one week or so at Mid South's Beltsville location in early 2000. He claimed that Mid South discontinued these displays when he was informed by Toler of a possible trademark infringement. He denied violating or infringing Guardian's trademark after he received notice from Toler. According to Flynn, all of the doors were being sold only under the name "American Insulator." Flynn admitted, however, that he never looked inside the boxes containing the doors to check the literature provided, and he had not taken any steps to change references to Guardian Security Storm Doors that were on the literature.

On April 4, 2000, Flynn wrote to Christopher Toler, informing him that Mid South then had 32 Guardian Security Storm Doors in stock. Flynn wrote, in part:

This letter is to confirm that Mid South Building Supply of Maryland will not display or order any security doors under the Guardian name. We currently have 32 doors in stock at our Baltimore location that we would sell with the understanding we would not reorder.

In return, your company will continue the volume of business done with Mid South Building Supply of Maryland before payments to us stopped and we ceased shipping products to your company. The average purchase by your company for the three months November to January was $12,265.

On November 14, 2001, Wayne Males, a private investigator, was asked by counsel for Guardian, to go to Mid South's Baltimore location to purchase a Guardian Security Storm Door. He testified that he was informed that there was only one door left. He paid cash for the door and was given a receipt. The box he was given had the words "Guardian Security Storm Door" printed on it. He put the door in his truck and delivered it to the office of Guardian's' attorney.

Patrick Toler testified that he opened the box purchased by Males. In addition to the door, Patrick Toler found a warranty and other documents identifying the door as a Guardian Storm Door.

We shall include additional facts as necessary in our discussion of the issues presented.

### *Discussion*

### *Standard of Review*

 Since this case is an appeal from a bench trial, we shall apply the same standard of review that we applied in the parties' previous appeal in *Guardian I:*

> In an appeal from a bench trial, " 'we review the case on the law and the evidence.' " *Green v. Bellerive Condos. Ltd. P'ship,* 135 Md.App. 563, 570[, 763 A.2d 252] (2000) (quoting Md. Rule 8–131(c)), *cert. denied,* 363 Md. 206[, 768 A.2d 55], *cert. denied,* 534 U.S. 824[, 122 S.Ct. 60, 151 L.Ed.2d 28] (2001). We "will not set aside the judgment of the trial court on the evidence unless clearly erroneous." Md. Rule 8–131(c). " '[I]f "competent material evidence" supports the trial court's findings, we must uphold them and cannot set them aside as "clearly erroneous." ' " *Shofer v. Stuart Hack Co.,* 124 Md.App. 516, 527[, 723 A.2d 481] (citations omitted),

*cert. denied,* 354 Md. 331[, 731 A.2d 440] (1999). We will also "give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8–131(c). "With respect to the lower court's application of the law to the facts, we apply the abuse of discretion standard." *Shofer,* 124 Md.App. at 527–28[, 723 A.2d 481].

▮ We do not evaluate conflicting evidence but assume the truth of all evidence, and inferences fairly deducible from it, tending to support the findings of the trial court, and, on that basis, simply inquire whether there is any evidence legally sufficient to support those findings. *Sea Watch Stores Limited Liability Co. et al. v. The Council of Unit Owners of Sea Watch Condominium,* 115 Md.App. 5, 31–32, 691 A.2d 750 (1997).

### *Trademark Infringement*

Trademarks are "a universal phenomenon in that the legal system of almost every nation in the world recognizes some form of identification of the source and quality of goods." J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition, § 2:6 (4th ed. 2003). According to Professor McCarthy:

> From an economic point of view, a trademark is merely a symbol that allows a purchaser to identify goods or services that have been satisfactory in the past and reject goods or services that have failed to give satisfaction.
>
> &ast; &ast; &ast;
>
> Trademarks fix responsibility. Without marks, a seller's mistakes or low quality products would be untraceable to their source. Therefore, trademarks create an incentive to keep up a good reputation for a predictable quality of goods. An important purpose underlying trademark law is the protection of the trademark owner's investment in the quality of the mark and the quality of the goods or services the mark identifies.

1 McCarthy at §§ 2:4 and 2:6.

Under federal law, trademarks are governed by 15 U.S.C. § 1051 *et seq.* (commonly referred to as the Lanham Act).

Section 1127 defines a trademark as "any word, name, symbol, or device or combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others."[1] 15 U.S.C. § 1127.

Maryland statutory law uses the term "mark" to refer to both trademarks and service marks. Section 1–401(c) of the Business Regulations article of the Maryland Code provides:

*(c) Mark.*—"Mark" means a name, symbol, word, or combination of 2 or more of these that a person:

(1) places on goods that the person sells or distributes, a container of the goods, a display associated with the goods, or a label or tag affixed to the goods to identify those goods that the person makes or sells and to distinguish them from goods that another person makes or sells; or

(2) displays or otherwise uses to advertise or sell services that the person performs to identify those services that the person performs and to distinguish them from services that another person performs.

■■ The essential element of a trademark is the exclusive right of its owner to use a word or device to distinguish his or her product. Infringement of a trademark consists of unauthorized use or colorable imitation of a mark already appropriated by another on goods of a similar class. *Block v. Jung Arch Brace Co.,* 300 F. 308 (C.C.A.6Ohio), *cert. denied,* 266 U.S. 620, 45 S.Ct. 99, 69 L.Ed. 472 (1924); *Stahly, Inc. v. M.H. Jacobs Co.,* 87 F.Supp. 48 (N.D.Ill.1949), *modified on other grounds,* 183 F.2d 914 (1950), *cert. denied,* 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650 (1950). In trademark infringement litigation, the trademark is juxtaposed against another's usage to determine whether the usage is likely to confuse customers. 1 McCarthy § 2:7. The likelihood of confusion is the "key-

---

1. The term "trademark" is also used to refer to a word or symbol used to identify services, but such marks are more specifically called "service marks." The Lanham Act separately defines "service marks." For the most part, the legal requirements of both trademarks and service marks are the same.

stone of infringement." *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 462 (4th Cir.), *cert. denied,* 519 U.S. 976, 117 S.Ct. 412, 136 L.Ed.2d 325 (1996).

Trademark infringement under Maryland statutory law is governed by § 1–414 of the Business Regulations article,[2] which provides:

(a) *In general.*—Subject to § 1–402 of this subtitle, a person may not:

(1) use, without the consent of the registrant, a reproduction or colorable imitation of a mark registered under this subtitle in connection with the sale, offering for sale, or advertising of goods or services if the use is likely to confuse or deceive about the origin of the goods or services; or

(2) reproduce or colorably imitate a mark registered under this subtitle and apply the reproduction or colorable imitation to an advertisement, label, package, print, receptacle, sign, or wrapper that is intended to be used:

(i) with goods or services; or

(ii) in conjunction with the sale or other distribution of goods or services in the State.

(b) *Civil liability.*—(1) A person who violates this section is liable in a civil action to a registrant for any remedy provided in this section.

(2) A registrant may recover profits or damages from a person who violates subsection (a)(2) of this section only if the person intended that the mark be used to confuse or deceive.

---

2. Maryland has provided a mechanism for the registration of trademarks since 1892. See Chapter 357, Laws of Maryland 1892. However, the General Assembly did not adopt a modern scheme of trademark registration until 1954, following the enactment of the Lanham Act and the approval of a "Model State Trademark Bill" in 1950 by the National Association of Secretaries of State and the Drafting Committee of the Council of State Governments. See Chapter 63, Laws of Maryland 1954.

(c) *Injunction authorized.* A registrant may sue to enjoin the display, manufacture, sale, or use of a reproduction or colorable imitation of a mark of the registrant.

(d) *Judicial remedies.*—A court of competent jurisdiction may:

(1) grant an injunction to restrain the display, manufacture, sale, or use of a reproduction or colorable imitation of a registered mark;

(2) require the defendant to pay to the registrant for the wrongful display, manufacture, sale, or use of a reproduction or colorable imitation of a mark:

(i) any profit that the defendant derived;

(ii) any damages that the registrant suffered; or

(iii) both; and

(3) require the defendant to deliver to an officer of the court or to the registrant, for destruction, any reproduction or colorable imitation of the mark that is in the possession or under the control of the defendant.

15 U.S.C. § 1114 provides, in part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

\* \* \*

(2) Notwithstanding any other provision of this chapter, the remedies given to the owner of a right infringed under this chapter or to a person bringing an action under section 1125(a) or (d) of this title [3] shall be limited as follows:

(A) Where an infringer or violator is engaged solely in the business of printing the mark or violating matter for others and establishes that he or she was an innocent infringer or innocent violator, the owner of the right infringed or the person bringing the action under section 1125(a) of this title shall be entitled as against such infringer or violator only to an injunction against future printing.

\* \* \*

(E) As used in this paragraph—

(i) the term "violator" means a person who violates section 1125(a) of this title; and

(ii) the term "violating matter" means matter that is the subject of a violation under section 1125(a) of this title.

---

**3.** Section 1125(a) of the Lanham Act provides:

**(a) Civil action**

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

■ It is clear that trademark infringement cases under either the Maryland statute or the Lanham Act are based on the same legal theory and require the same proof. *See Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F.Supp.2d 454, 460 (D.Md.2002)("The test for trademark infringement and unfair competition under state law is the same as the test under the Lanham Act."); *St. Joseph Hospital v. Quinn*, 241 Md. 371, 377, 216 A.2d 732 (1966) (when a provision of Maryland law is patterned after a provision of the law of other jurisdictions, the construction given that provision in those other jurisdictions is persuasive as to the meaning of the Maryland act). Under both the Lanham Act and the Maryland statute, the moving party must show (1) that it possesses a mark; (2) that the defendant used the mark without the registrant's consent; (3) that the defendant's use of the mark occurred in commerce; (4) that the defendant used the mark in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (5) that the defendant used the mark in a manner likely to cause confusion or to cause mistake or to deceive. 15 U.S.C. § 1114(1); *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir.2001).

■ The test requires proof of likelihood of confusion; evidence of actual confusion is unnecessary in a trademark infringement suit. *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455 (4th Cir.1996); *Lone Star Steakhouse and Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 933 (4th Cir.1995); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir.1986). In proving likelihood of confusion, the moving party must show that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question. *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 463 (4th Cir.1996); *Yarmuth–Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir.1987) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)). Expansive interpretation should be given to the

likelihood of confusion, so as to extend protection against the use of a mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner. *Anheuser–Busch, Inc. v. Balducci Publications*, 28 F.3d 769 (8th Cir.1994), *cert. denied*, 513 U.S. 1112, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995).

In *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984), and later in *Lone Star Steakhouse*, 43 F.3d at 933, the Fourth Circuit Court of Appeals identified a number of factors to consider in ascertaining the likelihood of confusion between two trademarks:

(1) the strength or distinctiveness of the senior mark;

(2) the similarity of the two marks;

(3) the similarity of the goods or services that the marks identify;

(4) the similarity of the facilities employed by the parties to transact their business; [4]

(5) the similarity of the advertising used by the parties;

(6) the defendant's intent in adopting the mark; and

(7) actual confusion.

These factors are not meant to be rigidly applied in infringement actions; they are meant as a guide—a catalog of various considerations that may be relevant in determining the ultimate question of likelihood of confusion. *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir.1992), *cert. denied*, 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992). In *Sara Lee*, the Fourth Circuit recognized that there are other factors that may be considered relevant in analyzing the likelihood of confusion, such as the quality of the defendant's product and the sophistication of the consuming public. *Sara Lee*, 81 F.3d at 463–64. With these standards in mind, we shall examine each of Mid South's contentions.

---

4. In *M. Kramer Mfg. Co., Inc. v. Andrews*, 783 F.2d 421, 448 n. 24 (4th Cir.1986), the Fourth Circuit Court of Appeals phrased this factor as "the similarity of sales methods, *i.e.*, retail outlets or customers."

### *Likelihood of Confusion*

### *A. Distinctiveness of Guardian's Mark*

Mid South contends that the trial court erred in finding that it infringed on Guardian's trademark because Guardian failed to show a strong likelihood of confusion. Specifically, Mid South first complains that the trial court erred in finding that Guardian's mark is distinctive and is, therefore, entitled to substantial protection. Mid South argues that "although the word 'Guardian' may suggest security and/or protection of some type, the suggestion is not limited to the realm of storm doors and as such the suggestion is weak." We find no error in the court's finding.

The distinctiveness of marks was discussed at length in *Sara Lee*, where the Fourth Circuit wrote:

The protection accorded trademarks is directly related to the mark's distinctiveness. "Fanciful," "arbitrary," and "suggestive" marks are inherently distinctive, and thus receive the greatest protection against infringement. 1 McCarthy § 11.01[1]. Fanciful marks are, in essence, made-up words expressly coined for serving as a trademark. Some examples of fanciful marks are Clorox (R), Kodak (R), Polaroid (R), and Exxon (R). *Id.* at § 11.03[4].

Arbitrary marks are comprised of words in common usage, but, because they do not suggest or describe any quality, ingredient, or characteristic of the goods they serve, are said to have been arbitrarily assigned. Examples include Tea Rose (R) flour, Camel (R) cigarettes, and Apple (R) computers. *Id.* at § 11.04[3]. Though tea rose, camel, and apple are—unlike Clorox (R) and Kodak (R)—words denoting "real" things, they are similar to fanciful marks in that they neither suggest any mental image of the associated product nor describe it in any way.

Suggestive marks connote, without describing, some quality, ingredient, or characteristic of the product. Coppertone (R), Orange Crush (R), and Playboy (R) are good examples of suggestive marks because they conjure images of the associated products. *Id.* at § 11.23. These marks are

nevertheless not descriptive; although they are meant to project a favorable or idealistic image with which a prospective user might identify, a person without actual knowledge would have difficulty in ascertaining the nature of the products that the marks represent.

In contrast to fanciful, arbitrary, or suggestive marks, there are marks that are not inherently distinctive. For instance, certain marks merely describe a function, use, characteristic, size, or intended purpose of the product. Examples of such "descriptive" marks include After Tan post tanning lotion, 5 Minute glue, King Size men's clothing, and the Yellow Pages telephone directory. *Id.* at § 11.08. Marks that are merely descriptive are accorded protection only if they have acquired a "secondary meaning," that is, if "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Dayton Progress [Corp. v. Lane Punch Corp.*, 917 F.2d 836] at 839 [ (4th Cir.1990) ] (quoting *Inwood Laboratories v. Ives Laboratories,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Coca–Cola (R) is probably the paradigm of a descriptive mark that has acquired a secondary meaning. *Sara Lee,* 81 F.3d at 464.

The court in *Sara Lee* went on to discuss generic terms, which identify the general nature of an item and denominate a type, kind, genus or subcategory of goods:

"Generic" terms are the common name of a product or service itself, and can never be trademarks. *Perini [Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 127 (4th Cir.1990)]. Examples of brand names held to be generic terms are Convenient Store retail stores, Dry Ice solid carbon dioxide, Light Beer ale-type beverages, and, in a case where a once-fanciful mark had, over time, been assimilated into the language, Thermos vacuum-insulated bottles. 2 McCarthy § 12.03 (citation omitted).

*Sara Lee,* 81 F.3d at 464. *See also Dayton Progress Corp. v. Lane Punch Corp.,* 917 F.2d 836, 839 (4th Cir.1990) (quoting

*G. Heileman Brewing Co. v. Anheuser–Busch, Inc.,* 873 F.2d 985, 997 (7th Cir.1989)).

Mid South contends that the phrases "a genuine" and "security storm door" are nothing more than general descriptions of Guardian's product. While Mid South acknowledges that the word "Guardian" "may be suggestive," in that it "may suggest security and/or protection of some type," it contends that the mark is weak because the suggestion is not limited to the realm of storm doors.

 The strength of a mark " 'ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source.' " *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 93 (4th Cir.1997), *cert. denied,* 523 U.S. 1095, 118 S.Ct. 1561, 140 L.Ed.2d 793 (1998) (citing *Estee Lauder, Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir.1997) (quoting Restatement (Third) of Unfair Competition, § 21 (1995))).

 In the case *sub judice,* the court considered the testimony of Stephen Genseal, sales representative for Guardian, who stated that, on average, once or twice a week, people tell him that they can get security storm doors cheaper from another retailer or company. He specifically testified that he has lost sales as a result of the fact that others are selling Guardian Security Storm Doors. Genseal stated that in the past six months he had two customers seek to cancel their contracts because they found another company selling the same product and he had to reduce the prices in order to keep the contracts.

Genseal's testimony was coupled with the testimony of Christopher Toler who stated that Guardian had received numerous telephone calls to repair doors that it did not make or sell. Based on this evidence, we find no error in the trial court's conclusion that Guardian's mark is distinctive and entitled to substantial protection.

Mid South further contends that Guardian's mark lacks commercial strength, that is, marketplace recognition, because

Guardian failed to prosecute others for trademark infringement. Mid South claims that the failure to prosecute demonstrates that "the mark may be so crowded in by similar marks used by competitors that the mark is alive, but weakened." We find no error in the trial court's decision to reject this argument. Although Christopher Toler acknowledged that there are other infringers "out there," there was no evidence presented to indicate how many other infringers might exist or how many similar marks are used by competitors. Moreover, although Toler first became aware that Guida was selling security storm doors under the name Guardian in 1996, he was not aware that Guida was doing substantial business in Maryland until 2000, when Patrick Toler brought him brochures he had obtained from Mid South. Finally, the evidence established that since the time Guardian's mark was registered in Maryland and in the United States Patent and Trademark Office, Guardian has sent letters to other alleged infringers regarding the sale of Guardian Security Storm Doors. All of this evidence supports the trial court's decision rejecting Mid South's contention that Guardian's mark has been weakened.

**B. Similarity of the Marks and Similarity of the Goods**

In considering the issues of the similarity of the mark and the similarity of the product, the trial court determined that the evidence weighed strongly in favor of Guardian because Mid South was selling the identical product and using the identical mark. The judge specifically noted that, although there was testimony regarding differences in the quality of the products sold by the parties, the "product appearance is virtually identical." Mid South does not dispute the similarity of the storm doors that the marks identify. It does, however, take issue with the trial court's finding that the similarity of the marks weighed strongly in favor of Guardian. It contends that "the Court had very little evidence before it from which a comparison of the marks could have been made." We disagree.

The trial court had before it one of the brochures obtained from Mid South by Patrick Toler, the box and door purchased

from Mid South by Arthur Males, and the warranty and installation instructions from that box. The Fourth Circuit has held that, in evaluating the similarity of two marks, "the marks need only be sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the mark." *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 936 (1995) (citing *Pizzeria Uno*, 747 F.2d at 1534–35). *Sub judice*, the dominant portion of the marks at issue—"Guardian"—is the same, thus supporting the trial court's finding that the similarity of the marks favored Guardian.

### C. Similarity of Facilities Used by the Parties

Mid South contends that, "[t]o the extent that the trial court found as a fact that the similarity of the facilities that the two parties use in their businesses favored Guardian Door over Mid South, such finding is unsupported by substantial record evidence and is therefore clearly erroneous." Mid South further argues that there could not be any overlap between the parties' target markets because it "sells primarily to contractors and Guardian Door sells primarily directly to homeowners."

Contrary to Mid South's contention, the trial court did not find that this factor favored Guardian. In considering the similarity of the facilities used by the parties to transact their respective businesses, the trial court determined that this issue "does not play any role in this case" because "[a]ny difference which exists has little if any effect on consumer perceptions." We find no error in this finding.

### D. Similarity of Advertising Methods

In addressing this factor, the trial court stated:

The issue of the similarity of the advertising used by the parties plays no role in this case because no evidence regarding it was introduced other than the two brochures taken from Mid South's place of business. The "Guardian" brochure which [Patrick] Toler found at Mid South's place of business clearly favors Guardian. The "American Insula-

tor" brochure does not help Mid South because there is no evidence that it is shown to consumers, and in any case as Mr. Flynn testified, the only permanent piece of paper the consumer receives when he purchases the product either directly or indirectly from Mid South is a warranty with the name "Guardian Security Storm Door" on it.

Mid South contends that this finding was unsupported by substantial record evidence. We disagree. Mid South's Vice President, Daniel Flynn, acknowledged that the "Guardian" brochures were on display for a week or so in early 2000 and that Guardian doors were on display during the same week at the company's Beltsville location. Although he claimed that the displays were discontinued after he was informed of the possible trademark infringement, and that the doors were then sold under the American Insulator name, he also admitted that he never looked inside the boxes to see what was stated on the written literature and he has not done anything to change the literature that is contained in the boxes. This evidence, coupled with the written warranty containing the name "Guardian Security Storm Doors," amply supports the trial court's finding.

### E. Intent to Confuse the Buying Public

On the issue of the intent to confuse the buying public, the trial court determined:

The issue of the defendant's intent in using the same mark again is important here. Mr. Flynn testified that Mid South is using the name "American Insulator" on its security storm doors, but the evidence is to the contrary. Mr. Flynn, as Mid South's representative, obviously understands the possibility of confusion from the use of the same name for the same product. The problem is that by his own admission he has done nothing about it. Clearly, Mid South never intended to terminate its infringement once it was notified of the problem.

Mid South complains that this finding is not supported by the evidence because after learning of the alleged trademark

violation, it removed the "Guardian" promotional materials from its showrooms and marketed the doors under the name, "American Insulator." Mid South denies that it intentionally continued to use the Guardian name because, according to Flynn, it was unaware that the storm door box and warranty information showed the name "Guardian." Mid South suggests that the fact that a purchaser may see some reference to "Guardian" after the purchase is immaterial because customers would not see any such reference until after the purchase. We disagree and explain.

██ "Evidence of bad faith is a strong indication that a likelihood of confusion exists." *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F.Supp.2d 454, 463 (D.Md.2002). In *Pizzeria Uno*, 747 F.2d at 1535, the Fourth Circuit wrote:

> The intent of the defendant is sometimes a major factor in infringement cases. If there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion. But if there is good faith belief that a subsequently-adopted mark will not lead to confusion, however, that intent is no defense if a court finds actual or likelihood of confusion.

(Citations omitted). In *Sara Lee*, the Fourth Circuit commented upon this language, stating:

> In other words, we presume that the person who sets out to infringe on another's trademark has more brains than scruples, and will likely succeed. Cf. *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir.1990):
>
> > When a newcomer to the market copies a competitor's trade dress, its intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied. Logic requires ... that from such intentional copying arises a presumption that the

newcomer is successful and that there is a likelihood of confusion.

*Sara Lee,* 81 F.3d at 466.

Here, there was ample evidence to support the trial court's conclusion that Mid South never intended to terminate its infringement once it was notified of the problem. Daniel Flynn, Mid South's Vice President, denied infringing upon Guardian's trademark after he was notified by Christopher Toler of the violation. He claimed that the trademark was not violated because the storm doors were sold under the name, "American Insulator." He testified, however, that he never checked the literature that came in the box with the storm doors and, as of the date of the trial, he had not done anything to change that literature. This testimony was coupled with the testimony of private detective Arthur Males, who stated that he went to Mid South and specifically asked to purchase a Guardian Security Storm Door. He was told that there was one door left, and he purchased it. Males saw that the box containing the storm door identified it as a "Guardian Security Storm Door." This evidence was sufficient to support the trial court's conclusion that Mid South never intended to cease its infringement after being notified by Toler of the violation.

### F. Actual Confusion

 Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion. *Lone Star Steakhouse & Saloon, Inc.,* 43 F.3d at 937 (such evidence "is entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion."). In *Sara Lee,* the Fourth Circuit Court of Appeals commented on the actual confusion factor as follows:

We have previously acknowledged that the distinctiveness of the senior user's mark is "the first and paramount factor" in determining the likelihood of confusion. *Pizzeria Uno* at 1527. If the strength of the senior mark is the alpha of infringement analysis, then evidence of actual confusion is

surely the omega; where the defendant in an infringement case has elected to use a mark similar to that of a competitor's distinctive mark, and, as a result, has actually confused the public, our inquiry ends almost as soon as it begins. *Id.*, 81 F.3d at 467.

In the case *sub judice*, the trial court addressed the issue of actual confusion as follows:

Although a plaintiff is only required to show a likelihood of confusion to prevail, there is ample evidence of actual confusion. Both Mr. Toler and Mr. Genseal testified to instances of actual confusion arising from the use of the "Guardian Security Storm Door" mark on products not made by Guardian. Mr. Genseal testified that several times each month customers upon whom he has called have told him that they can obtain a "Guardian Security Storm Door" for less from other vendors. He explains to these customers that these doors are not made by Guardian, however, usually he can only make the sale in such cases if he lowers the price substantially. This, of course, reduces Guardian's profit on each such door.

Mr. Toler testified about his experience with Mr. Lindell Bowers. Mr. Bowers had purchased a "Guardian Security Storm Door" which was manufactured by Guida. When Mr. Bowers' security storm door went bad, he called Guardian for repair or replacement based on the warranty which identified the door as a "Guardian Security Storm Door." Mr. Bowers was very disappointed when Mr. Toler told him that Guardian did not manufacture the door, was not responsible for it, and could not honor the warranty.

Mid South disputes the trial court's finding of actual confusion because Guardian "was only able to prove that it lost a few sales because some unknown entity was selling storm doors in violation of Guardian Door's trademark." According to Mid South, the trial court erred in admitting (1) the testimony of Christopher Toler regarding telephone calls received for warranty repairs on doors that Guardian neither manufactured nor sold and (2) the testimony of Steven Gen-

seal regarding statements by customers that they could purchase Guardian Security Storm Doors from other sources for a lower cost. Mid South contends that, absent some evidence that it actually caused the confusion complained of, the testimony of Toler and Genseal was irrelevant. We disagree.

Trademark infringement must be determined from the customer's point of view. Both the Lanham Act and the Maryland statute extend "protection against use of [plaintiff's] mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Anheuser–Busch v. Balducci,* 28 F.3d 769 (citing McCarthy, *Trademarks and Unfair Competition,* § 24.03, at 24–13 (3d ed. 1992); *Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 398 (1987); *Nike, Inc. v. "Just Did It" Enters.,* 6 F.3d 1225, 1228 (7th Cir.1993); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 204–05 (2d Cir.1979); *Jordache Enters., Inc. v. Levi Strauss,* 841 F.Supp. 506, 514–15 (S.D.N.Y.1993)). To prevail in a trademark case, a plaintiff must show that an appreciable number of reasonable customers would be confused as to the source of the services offered by the parties by reason of their respective marks." *Sterling Acceptance Corp.,* 227 F.Supp.2d at 465 (and cases cited therein). "[M]eager evidence of actual confusion is at best *de minimis*" and "occasional instances of confusion or thoughtless errors by inattentive purchasers are of little significance." *Id.*

In the instant case, Guardian provided more than meager evidence of actual confusion. Stephen Genseal testified that, on average, once or twice a week customers tell him that they can obtain a Guardian Security Storm Door elsewhere for a lower price. Within the six months prior to the trial, Genseal had two customers cancel their signed contracts because of other companies selling Guardian Security Storm Doors for a lower price, and he had to reduce the contract price in order to get the sales. Christopher Toler testified that Guardian had been receiving a lot of calls regarding repair requests

from people who were not listed as their customers. Toler testified that he decided to go on a service call to Mr. Bowers to investigate the matter. Bowers gave Toler a copy of a warranty for a Guardian Security Storm Door that did not originate with Guardian. Bowers told Toler that he had obtained Guardian's telephone number from the telephone book.

Even though there was no direct evidence linking the Guardian storm doors sold by Mid South to the incidents of actual confusion testified to by Toler and Genseal, there was ample evidence to show that Guardian storm doors such as those sold by Mid South were perceived by the buying public as having been produced by Guardian. That evidence, coupled with the testimony of private investigator Males, which demonstrated that Mid South was indeed selling security storm doors in boxes and with literature indicating the Guardian name, was sufficient to support the trial court's finding of actual confusion.

### *Damages*

Once a violation under the Lanham Act has been established, the plaintiff may be entitled to recovery under 15 U.S.C. § 1117, which provides, in part:

(a) When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 [5] of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of

---

5. The relevant provisions of 15 U.S.C. § 1114 are set forth *supra.* We note here that, under subsection (b) of 15 U.S.C. § 1114, "the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive." There is no similar language regarding knowledge directed specifically toward subsection (a).

the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

(b) In assessing damages under subsection (a) of this section, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(a) of this title or section 380 of Title 36 that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services.

\* \* \*

Section 1117(a) makes clear that the unavailability of actual damages as a remedy does not preclude a plaintiff from recovering an accounting of the defendant's profits. Under § 1117(b), a plaintiff may recover treble damages, together with reasonable attorney's fees, for violations consisting of the intentional use of a mark.

Section 1–414 of the Business Regulation article of the Maryland Code provides, in relevant part:

(b) *Civil liability.*—(1) A person who violates this section is liable in a civil action to a registrant for any remedy provided in this section.

(2) A registrant may recover profits or damages from a person who violates subsection (a)(2) [6] of this section only if the person intended that the mark be used to confuse or deceive.

\* \* \*

*(d) Judicial remedies.*—A court of competent jurisdiction may:

(2) require the defendant to pay to the registrant for the wrongful display, manufacture, sale, or use of a reproduction or colorable imitation of a mark:

(i) any profit that the defendant derived;

(ii) any damages that the registrant suffered; or

(iii) both;

In the case *sub judice,* the circuit court rejected Guardian's request for its lost profits, but entered judgment in favor of Guardian in the amount of $45,990.33, an amount equal to three times Mid South's profits from the sale of the subject security storm doors. In reaching that decision, the court adopted as its own the following language from the proposed findings of facts and conclusions of law prepared by Guardian:

Mid South produced records of 155 sales of "Guardian Security Storm Doors." The total revenue from sales of these doors was $51,460.36. Mr. Flynn testified that margins on the doors ranged from a low of twenty percent to as much as fifty percent for "walk in" customers such as Mr. Males. At a twenty percent mark up, this sales volume produces a profit of $10,200.70; at a thirty percent mark up,

---

**6.** Subsection (a)(2) is directed to the printers and publishers of marks registered under Maryland law. It provides that a person may not "reproduce or colorably imitate a mark registered under this subtitle and apply the reproduction or colorable imitation to an advertisement, label, package, print, receptacle, sign, or wrapper that is intended to be used: (i) with goods or services; or (ii) in conjunction with the sale or other distribution of goods or services in the State."

this sales volume produces a profit of $15,330.11. In view of the fact that damages do not have to be proved with specificity and that most sales were made at a mark up of greater than 20 percent, I conclude that a mark up of 30 percent is reasonable for this purpose, and therefore an award of $15,330.11 as infringer profits is appropriate here.

\* \* \*

The Lanham Act, 15 U.S.C. § 1117(b), permits treble damages for willful infringement of a registered mark. Mid South's act of continuing to sell "Guardian Security Storm Doors" after having received notice from Guardian of its trademark in that very name constitutes willful infringement. That Mid South acted willfully is evident from two facts: (1) Mid South continued to sell "Guardian Security Storm Doors" after it received notice from Mr. Toler in April 2000, and (2) it continued to sell these doors even after the counterclaim was filed and Mr. Males bought the door. In fact, Mr. Flynn's testimony is very clear that down to the last day of trial Mid South continued to sell doors with literature in the box identifying the doors as "Guardian Security Storm Doors." When Mid South's profit of $15,330.11 calculated above is trebled it yields a total of $45,990.33.

Mid South contends that the trial court erred in awarding infringer profits to Guardian because Guardian (1) failed to prove that Mid South acted in bad faith and (2) failed to prove infringer profits with adequate specificity. In addition, Mid South argues that the doctrine of laches should apply here to preclude the award of damages. We disagree and explain.

### Bad Faith

Mid South claims that in order to be entitled to an accounting and a recovery of defendant's profits, Guardian was required to prove that Mid South acted in bad faith. In support of this contention, Mid South directs our attention to: *Rolex Watch U.S.A., Inc. v. Meece*, 158 F.3d 816 (5th Cir.1998); *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A.,*

*Inc.*, 80 F.3d 749 (2d Cir.1996); *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F.Supp.2d 454, 466 (D.Md.2002); *A.C. Legg Packing Co., Inc. v. Olde Plantation Spice Co., Inc.*, 61 F.Supp.2d 426, 433 (D.Md.1999); and *Motor City Bagels, L.L.C. v. American Bagel Co.*, 50 F.Supp.2d 460, 488 (D.Md. 1999). The cases cited by Mid South provide that in order to be entitled to an accounting and a recovery of defendant's profits, the plaintiff must prove that the defendant acted in bad faith; that is, with "willful deception" or "with the deliberate intent to cause confusion, mistake or to deceive purchasers." *Sterling Acceptance Corp.*, 227 F.Supp.2d at 466. Mid South contends that there is no evidence that it acted in bad faith and, therefore, Guardian is not entitled to a recovery of Mid South's profits.

Guardian contends that, by its terms, the Lanham Act does not require a finding of bad faith in order to support an award of infringer profits. In support of this contention, Guardian directs our attention to a number of federal circuit court cases: *Sands, Taylor & Wood v. The Quaker Oats Co.*, 34 F.3d 1340 (7th Cir.1994); *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595 (6th Cir.1991); *Roulo v. Russ Berrie & Co., Inc.*, 886 F.2d 931 (7th Cir.1989), *cert. denied*, 493 U.S. 1075, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990); and, *Burger King Corp. v. Mason*, 855 F.2d 779 (11th Cir.1988). According to Guardian, these cases provide that profits may be awarded in the discretion of the trial judge subject only to the principles of equity. There is no express requirement that the plaintiff establish bad faith to justify an award of profits. In addition, Guardian argues that there is no requirement of a showing of willful conduct as a prerequisite to an award under § 1–414(d) of the Business Regulations article of the Maryland Code, except in cases of a printer or publisher.

We need not resolve the issue of which standard should be applied in awarding infringer profits, however, because it is clear from the record presented that there was sufficient evidence of bad faith on Mid South's part to justify an award of infringer profits.

 Christopher Toler testified that he met with Mid South's Vice President, David Flynn, and advised him that Mid South was infringing on Guardian's trademark. According to Toler, Flynn agreed to stop selling the doors. However, by letter dated April 4, 2000, Flynn wrote to Toler, informing him that Mid South had 32 Guardian Security Storm Doors in stock "that we would sell with the understanding we would not reorder." At trial, although Flynn testified that all of the doors were sold under the name "American Insulator," he also admitted that he never looked inside the boxes containing the doors to check the literature provided and he never took any steps to change references to Guardian Security Storm Doors. This testimony, combined with the testimony of Patrick Toler and private investigator Wayne Males regarding the purchase of a Guardian Security Storm Door from Mid South on November 14, 2001, was sufficient to show that, even after receiving notice that it was infringing on Guardian's trademark, Mid South continued to engage in willful infringement deliberately intending to deceive or confuse purchasers. *See International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 754 (2d Cir.1996) (defendant cannot claim good faith belief that it was not infringing where it neither fully explored another's rights nor ceased infringing behavior when it was sued); *Nalpac, Ltd. v. Corning Glass Works,* 784 F.2d 752, 755–56 (6th Cir.1986) (exploitation of another's mark after knowledge of its existence suggests bad faith).

For the same reasons set forth above, we also reject Mid South's contention that the award of treble damages should be reversed because there was no evidence that Mid South willfully infringed upon Guardian's trademark.

### Specificity of Damages

Mid South next complains that the circuit court erred in its calculation of damages. In awarding damages, the court adopted the following language as its own:

Both the State and Federal trademark statutes authorize an award of the infringer's profits as one of the permissible

forms of damages. As the Fifth Circuit stated in *Rolex Watch U.S.A., Inc. v. Meece,* 158 F.3d 816, 824 (5th Cir. 1998), "[t]he purpose of section 1117 is to take all the economic incentive out of trademark infringement." An award of the infringer's profits at least partly achieves this goal. In assessing profits, the plaintiff need only prove gross sales; deductions must be established by defendant although here Guardian has calculated Mid South's actual profit based on Mid South's purchase price for the product. Mid South produced records of 155 sales of "Guardian Security Storm Doors." The total revenue from sales of these doors was $51,460.36. Mr. Flynn testified that margins on the doors ranged from a low of twenty percent to as much as fifty percent for "walk in" customers such as Mr. Males. At a twenty percent mark up, this sales volume produces a profit of $10,200.07; at a thirty percent mark up, this sales volume produces a profit of $15,330.11. In view of the fact that damages do not have to be proved with specificity and that most sales were made at a mark up of greater than 20 percent, I conclude that a mark up of 30 percent is reasonable for this purpose, and therefore an award of $15,330.11 as infringer profits is appropriate here.

Mid South contends that there was no evidence that it sold Guardian Security Storm Doors, only that it sold more than 150 storm doors manufactured by Guida, Inc. and that there was no evidence that the doors were sold on the strength of the Guardian trademark. The evidence indicates otherwise.

The invoices admitted in evidence clearly reflected that the doors were ordered from Guardian Security Storm Doors/Guardian Entry Systems in Philadelphia, Pennsylvania and were shipped to United Wholesale in Baltimore, Maryland. Daniel Flynn testified that the invoices were for Guardian Security Storm Doors that were purchased and sold by Mid South. At trial, Flynn gave the following testimony:

[Counsel for Guardian]: And is it true that your company has been doing business with a company in Philadelphia called Guida Manufacturing?

[Flynn]: That is correct.

Q. And you purchased security storm doors from Guida?

A. We do.

Q. And you purchased that security, Guardian Security Storm Door from Guida?

A. We do.

Q. And you sell—And you admit through February of this year you were selling Guardian Security Storm Doors purchased from Guida?

A. We sell these storm doors under a private labeling called American Insulator.

Q. When did that start?

A. American Insulator was going on long before we purchased United Wholesale.

Q. But you have been selling Guardian Doors like this one here (indicating), is that correct?

A. Yes.

Q. And the box says "Guardian Security Storm Door"?

A. Yes.

Q. And, if you would, would you look at Defendant's Exhibit 8.

A. Mm-hmm.

Q. That is the type of guarantee that is in the doors that you purchased from Guida, is that correct?

A. Yes.

Q. And it said "Guardian Security Storm Door," right?

A. Yes.

Q. And taking a look at, let's use this one, 10, which is a catalog, Mr. Toler testified that he purchased that, or had seen that at your company. Do you have any reason to disagree with him?

A. I have no reason to disagree that he obtained it at our location.

Q. Okay. And that is a brochure for Guardian Security Storm Doors?

A. Correct.

Q. I'd like you to take a look at what we have marked as Exhibit 13.

A. Yes.

Q. And those are invoices that were sent to your company by Guida, is that correct?

A. That is correct.

Q. And it says in the upper lefthand corner "Guardian Security Storm Doors," but those were manufactured by Guida in Philadelphia, is that correct?

A. That is correct. Guida—I don't know exactly what the relationship is. Guida has a company called Guardian Security Storm Doors. I don't know if they are sister companies or exactly what their relationship is. I know we always called it Guida, the ad guy with a big company. I don't know what the relationship is, whether they are sisters or not. But—

Q. But you do know that it is not my client's company?

A. Oh, yeah. That is correct.

Q. And these are for security storm doors?

A. Yes.

Q. And I don't presume that you buy doors just to keep them in stock, do you?

A. No.

Q. You buy doors so that you can sell them, is that correct?

A. That is correct.

Q. And very often the doors, a contractor comes in and gives you an order, specifically an order you work for that contractor, is that correct?

A. There are some Guardian. There are some Guardian, or security doors that we have in stock. And then there are others that we do not have in stock that they special order. There are many types of security doors.

Q. Okay. Now, over here (indicating). Let's just take the invoice here on Exhibit 13?

A. Yes.

Q. Where it says ordered. Well, it says "Customer," is that correct?

A. Yes.

Q. Untied Wholesale in Baltimore?

A. Yes.

\* \* \*

Q. And then your PO number?

\* \* \*

A. The PO number they give us could be anything. The PO number is really for their [the contractors'] benefit. So when they do receive the invoice and they look at the PO number they can go and associate what the invoice is, for what particular job it is for. So they either give a name or give a number.

Q. But wherever there is a PO number that has a name next to it, as opposed to this one here, which is state use of September 24, 1999, where it said soap. That is one that you buy just to have on stock in the back, is that correct?

A. Yes.

Q. Because these other ones are purchased for a particular customer service?

A. Yes. Most of the time.

Q. When they come in they are essentially sold to the people who ordered them, correct?

A. Yes.

Q. And even the ones that are purchased, the stock, those are essentially sold, aren't they?

A. Yes.

Q. And would you agree with me that all of the ones represented in this Exhibit 13, as having been ordered in June of 2001 have been sold to various people?

A. Have they all been sold? I cannot sit here and tell you that they have all been sold. I hope so. But can I tell you they have all been sold? No. Once they are in stock, it could be.

Q. To your knowledge are there any there that was purchased in June of last year?

A. To my knowledge, no.

Q. So we can presume that all these were either purchased, or they were sent back to the manufacturer for one reason or another?

\* \* \*

A. Yes.

Q. But the vast majority would have been sold to the customer, correct?

A. Yes.

Mid South failed to offer any evidence that some or all of the security storm doors identified on the invoices were not Guardian Security Storm Doors or that they were not sold in boxes labeled with the Guardian name or accompanied by literature containing the Guardian name. The actual invoices combined with Flynn's testimony was sufficient to support the trial court's finding that Mid South sold the Guardian Security Storm Doors identified on the invoices.

■■■■■ Mid South further claims that the trial court's decision to apply a thirty percent mark-up in calculating infringer profits was not supported by the evidence. Again, we disagree. Damages for trademark infringement are sufficiently proved if a reasonable basis of computation is afforded. An award is not rendered uncertain simply because the damages cannot be calculated with absolute exactness. *Borg–Warner Corp. v. York–Shipley, Inc.*, 293 F.2d 88 (7th Cir. 1961), *cert. denied*, 368 U.S. 939, 82 S.Ct. 381, 7 L.Ed.2d 338 (1961).

■■■■■ Flynn testified that Mid South would not sell a security storm door for below cost and that there is always a mark-up of some sort over the cost of the door. A regular mark-up would be 50 percent, although it could be less because the particular mark-up varies according to such things as how much business the purchaser does with Mid South, whether the door is direct shipped, and whether it is paid for COD. As

for the doors identified in the invoices admitted in evidence, Flynn testified that the vast majority of the doors identified in the invoices admitted in evidence would have been marked up at least 20 percent. None of them were direct shipped. In light of this evidence, we see no reason to disturb the trial court's decision to apply a 30 percent mark-up in calculating Mid South's profits.

## *Laches*

Mid South's final contention is that the trial court erred in finding that Guardian's trademark infringement action was not barred by laches. In trademark infringement cases, courts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, though having knowledge of an infringement, has, to the detriment of the defendant, unreasonably delayed in seeking redress. *Sara Lee,* 81 F.3d at 461 (citing McCarthy on Trademarks and Unfair Competition, § 31.02 (3d ed. 1995)). "In determining whether laches may operate as a defense to an infringement claim, a court should ordinarily consider (1) whether the owner of the trademark knew of the infringing use, (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable, and (3) whether the infringing user has been unduly prejudiced by the owner's delay." *Sara Lee,* 81 F.3d at 461, n. 7 (citing *Brittingham v. Jenkins,* 914 F.2d 447, 456 (4th Cir.1990)). *See also Skippy, Inc. v. CPC Int'l, Inc.,* 674 F.2d 209, 212 (4th Cir.1982), *cert. denied,* 459 U.S. 969, 103 S.Ct. 298, 74 L.Ed.2d 280 (1982). As the Fourth Circuit Court of Appeals stated in *Sara Lee,* however, the owner of a trademark "has no obligation to sue until 'the likelihood of confusion looms large.'" *Sara Lee,* 81 F.3d at 462 (quoting 4 McCarthy § 31.06[2][a] (quoting *Johanna Farms, Inc. v. Citrus Bowl, Inc.,* 468 F.Supp. 866, 881 (E.D.N.Y.1978))). *See also* Restatement 3rd, Unfair Competition, § 31, p. 321 (1995)("The doctrine [of laches] is not intended to encourage precipitous litigation, and a trademark owner is not required to take action at the first indication of possible infringement.").

■ Mid South argues that had Guardian timely challenged Guida, Inc.'s infringement, the infringing product would not have come into Mid South's possession and it would not have infringed upon Guardian's trademark. We reject this argument. Christopher Toler testified that he first learned of infringement by Guida in 1996. He contacted Guida and was assured that they had only one small account in Maryland and that most of their business was in Pennsylvania. At that time, Guardian's trademark had not been registered in either Maryland or with the United States Patent and Trademark Office, and there is nothing to suggest that the likelihood of confusion was "looming large" at that time.

Guardian first notified Mid South that it was infringing on Guardian's trademark in April 2000. The evidence supports the trial court's conclusion that, even after being notified of the infringement, and indeed, even after the filing of the counterclaim, Mid South continued to infringe on Guardian's mark. It is, therefore, disingenuous for Mid South to claim that it suffered harm from any delay on the part of Guardian in bringing a trademark infringement action against either Guida or Mid South. The evidence fully supported the trial court's decision to reject Mid South's laches defense.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**